# 23-7276

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL,

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the Eastern District of New York, Case No. 1:23-cv-00369-NRM-RML

---

## OPENING BRIEF OF APPELLANTS

---

GARY M. LAWKOWSKI
DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
703-574-1654
glawkowski@dhillonlaw.com

JOSIAH CONTARINO
DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
50 Park Place, Suite 1105
Newark, NJ 07102
917-423-7221
jcontarino@dhillonlaw.com

*Counsel for Appellants*

**Appellants Request Oral Argument**

## CORPORATE DISCLOSURE STATEMENT

Rare Breed Triggers, LLC has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock. Rare Breed Firearms, LLC has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Lawrence DeMonico and Kevin Maxwell, private individuals, have no parent corporation and no stockholders.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES ....................................................... v

JURISDICTIONAL STATEMENT .................................................. 1

STATEMENT OF THE ISSUES ................................................... 2

STATEMENT OF THE CASE ..................................................... 4

    A.    Nature of the case and relevant procedural history. ................... 4

    B.    Facts relevant to the issues submitted for review. ....................... 7

        i.    How the FRT-15 works compared to traditional semi-automatic rifles and machineguns. ................................... 7

        ii.    Appellants marketed the FRT-15 as legal based on their understanding that it does not satisfy the statutory machinegun definition. .................................. 10

        iii.    The privacy policy. ............................................... 12

        iv.    Cease-and-desist letter and Appellants' disagreement with the ATF. ................................................... 13

        v.    The ATF raids Appellants' manufacturer. ...................... 15

        vi.    Appellant DeMonico retrieves RBT's property at 3rd Gen. after the ATF's warrant expired. .......................... 16

        vii.    Appellants use a discreet shipping practice to avoid theft from their customers. .......................................... 17

SUMMARY OF ARGUMENT .................................................... 18

ARGUMENT ................................................................... 21

    I.    Standard of review. ................................................... 21

    II.    The district court's finding that Appellee has satisfied its burden to demonstrate it would likely prove at trial that Appellants engaged in a *Klein* conspiracy is errant both legally and factually. .................................................. 22

A.    Appellants' customer privacy policy is not evidence of a Klein conspiracy as a matter of law because it violated no legal duties and did not involve submitting false information to the Government. ........................................23

B.    The Court's factual finding that Appellants' customer privacy policy is evidence of a Klein conspiracy was clearly erroneous because there was no evidence Appellants had a duty to preserve or disclose their customer records. ...............................................28

C.    The court erred as a matter of law in finding Appellant DeMonico's retrieval of RBT's property from 3rd Gen. was evidence of a *Klein* conspiracy because it failed to identify how this act involved falsehoods provided to the government or the violation of a specific legal duty...32

D.    The court's finding that DeMonico intended to unlawfully impair the ATF's investigation by retrieving RBT's property from 3rd Gen. was clearly erroneous without evidence that he believed the ATF had a right to seize it. ..............................................................35

E.    The district court's factual finding that RBT's discreet shipping practice was a scheme to defraud the ATF is clearly erroneous because it was based on illogical, implausible, and self-contradicting inferences. ...............37

III.   The court's finding of mail and wire fraud should be reversed because the court erroneously equated Appellants' mere disagreement with the ATF's opinion, or anticipated opinion, with a fraudulent intent. ...........................................................44

A.    The Government must prove Appellants "knew" their oft-stated beliefs were false. ...............................................46

B.    Appellants publicly broadcasted their interpretation of the law. ...........................................................47

C. The court erroneously equated Appellants' knowledge of the ATF's differing opinion with knowledge Appellant's statements were false. ................................... 47

D. The court's analysis of good faith precludes cissent from Government opinion. ................................. 50

E. The ATF's changing policies and losses in court preclude deference to its opinions as infallible. ................ 55

IV. The Government's theory of fraud effectively amounts to a reapplication of the "right-to-control" theory that was rejected by the United States Supreme Court in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023) .................................................... 56

V. A "*Klein* conspiracy" no longer remains a valid theory in light of *Ciminelli* and other intervening case law. ................................. 60

A. "Defraud" requires the deprivation of a traditional property interest. ............................................................. 62

B. *Ciminelli* is irreconcilable with the doctrine of *Klein* conspiracy. ........................................................ 66

CONCLUSION ........................................................................... 70

CERTIFICATE OF SERVICE ................................................................. 71

CERTIFICATE OF COMPLIANCE ........................................................ 72

# TABLE OF AUTHORITIES

## Cases

*Aposhian v. Wilkinson,*
 989 F.3d 890 (10th Cir. 2021) .............................................................. 45

*Atlantic Cleaners & Dryers, Inc. v. United States.,*
 286 U.S. 427 (1932) .............................................................................. 67

*Berger v. State of N.Y.,*
 388 U.S. 41, (1967) ............................................................................... 34

*Briggs v. Bremby,*
 792 F.3d 239 (2d Cir. 2015). ................................................................ 21

*Cargill v. Garland,*
 57 F.4th 447 (5th Cir. 2023) ......................................................... 45, 55

Carpenter v. United States,
 484 U.S. 19 (1987) ................................................................................ 57

*Ciminelli v. United States,*
 143 S.Ct. 1121 (2023) ............................................................... 2, 20, 56

*Cleveland v. United States,*
 531 U.S. 12 (2000) ................................................................................ 63

*Coplan v. United States,*
 Case No. 12-1299, 2013 WL 1819823 (U.S. Apr. 26, 2013) ................ 67

*Dennis v. United States,*
 384 U.S. 855 (1966) ........................................................................ 19, 22

*Garland v. Cargill,*
 144 S. Ct. 374 (2023) .............................................................................. 4

v

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,

    920 F.3d 1 (D.C. Cir.) 762 F. App'x 7 (D.C. Cir. 2019)........................ 45

*Hammerschmidt v. United States*,

    265 U.S. 182 (1924)................................................................................ 24

*Jam v. International Finance Corporation*,

    139 S.Ct. 759 (2019) ............................................................................. 66

*Jean v. Sessions*,

    899 F.3d 182 (2d Cir. 2018) ................................................................. 66

*Lopez v. United States*,

    373 U.S. 427 (1963)............................................................................... 34

*McDonnell v. United States*,

    579 U.S. 550 (2016)............................................................................... 65

*McNally v. United States*,

    483 U.S. 350 (1987)......................................................................... 63, 67

*Mock v. Garland*,

    75 F.4th 563 (5th Cir. 2023) ................................................................ 45

*Motorola Credit Corp. v. Uzan*,

    322 F.3d 130 (2d Cir. 2003). ............................................................... 21

*National Association of Gun Rights, et al. v. Garland, et al.*,

    Case No. 4:23-cv-00830-O, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023)

    .......................................................................................................... 4, 45

*Neder v. United States*,

    527 U.S. 1 (1999) .................................................................................. 66

*Pasquantino v. United States*,

    544 U.S. 349 (2005)............................................................................... 67

*Percoco v. United States,*

  598 U.S. 319 (2023)................................................................65

*Porter & Dietsch, Inc. v. F.T.C.,*

  605 F.2d 294 (7th Cir. 1979)..................................................49

*Rare Breed Triggers, LLC v. Garland,*

  22-cv-85, 2022 WL 17175089 (D.N.D. Nov. 4, 2022)............15

*Rodden v. Wilkinson,*

  845 F. App'x 25 (2d Cir. 2021).............................................25

*Rogers v. Tennessee,*

  532 U.S. 451 (2001)...............................................................69

*Sekhar v. United States,*

  570 U.S. 729 (2013)...............................................................67

*U.S. v. Coplan,*

  703 F.3d 46 (2d Cir. 2012). ...................................................40

*United State v. Rare Breed Triggers, LLC, et al,*

  2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023). ........................62

*United States v McCargo,*

  464 F3d 192 (2d Cir. 2006) ...................................................33

*United States v. Atilla,*

  966 F.3d 118 (2d Cir. 2020). ..................................................22

*United States v. Ballistrea,*

  101 F.3d 827 (2d Cir. 1996). ..................................................19

*United States v. Caldwell,*

  989 F.2d 1056 (9th Cir. 1993).....................................26, 27, 33

*United States v. Gradwell*,

243 U.S. 476 (1917)...................................................................69

*United States v. Guadagna*,

183 F.3d 122 (2d Cir. 1999)........................................................46

*United States v. Gutman*,

711 F. App'x 20 (2d Cir. 2017)...................................................46

*United States v. Klein*,

247 F.2d 908 (2d Cir. 1957)........................................................62

*United States v. Margiotta*,

688 F.2d 108 (2d Cir. 1982)........................................................65

*United States v. Murphy*,

809 F.2d 1427 (9th Cir. 1987)...............................................25, 27

*United States v. Percoco*,

13 F.4th 158 (2d Cir. 2021).........................................................57

*United States v. Porter*,

591 F.2d 1048 (5th Cir. 1979)......................................................25

United States v. Sadler,

750 F.3d 585 (6th Cir. 2014)........................................................58

*United States v. Schwartz*,

924 F.2d 410 (2d Cir. 1991)........................................................46

*United States v. Zichetello*,

208 F.3d 72 (2d Cir. 2000)..........................................................69

*VanDerStok v. Garland*,

86 F.4th 179 (5th Cir. 2023).......................................................45

*Zervos v. Verizon New York, Inc.,*

    252 F.3d 163 (2d Cir. 2001). ................................................................21

## Statutes

18 U.S.C. § 1345 ..........................................................................................1

18 U.S.C. § 1345(a)(1)(A).......................................................................61

18 U.S.C. § 1346 ..............................................................................57, 64

18 U.S.C. § 371 ............................................................................... passim

28 U.S.C. § 1292(a)(1)..............................................................................1

## JURISDICTIONAL STATEMENT

This case arose when Appellee United States ("Appellee" or "Government") sued Appellants under 18 U.S.C. 1345 for injunctive relief alleging violation of various federal antifraud statutes resulting from their manufacture and sale of a firearm trigger. Filing their Complaint on January 19, 2023, the Government sought and received, *ex parte*, a temporary restraining order ("TRO") against Appellants from the United States District Court for the Eastern District of New York. The TRO enjoined Appellants from manufacturing or selling the firearm trigger. The district court exercised original and federal question jurisdiction under 18 U.S.C. § 1345 and 28 U.S.C. §§ 1331, 1345.

On that same date, the Government moved for a preliminary injunction under 18 U.S.C. § 1345, seeking to transform the district court's TRO into a preliminary injunction. After some discovery and a hearing, the district court granted a preliminary injunction on September 5, 2023. Appellants then timely filed their notice of appeal on October 4, 2023. *See* Fed. R. App. P. 4(a).

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

1

## STATEMENT OF THE ISSUES

1. Whether the Government satisfied its burden to demonstrate it would likely prove at trial that Appellants engaged in a *Klein* conspiracy when Appellant's actions did not involve submitting false information or violating legal duties owed to the Government, or other acts of dishonesty intended to impede the ATF, and where there are other deficiencies in the evidence?

2. Whether the district court erred by finding Appellants, who represented to customers that they believed the trigger they sold was not a machinegun, acted with the requisite fraudulent intent for mail and wire fraud because they anticipated or knew the ATF would opine that Appellants' trigger was a machinegun?

3. Whether the Government's theory of fraud effectively amounts to a reapplication of the "right-to-control" theory that was rejected by the United States Supreme Court in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023)?

4. Whether the term "defraud" in 18 U.S.C. § 371 may properly include actions to impede, impair, obstruct, or defeat lawful functions of the Government or its agencies in light of the Supreme Court's

2

reaffirmation in *Ciminelli* that "the 'common understanding' of the words 'to defraud' when the statute was enacted referred to 'wronging one in his property rights,'" *Ciminelli*, 143 S. Ct. at 1126 (citation omitted)? Put differently, whether the theory of a "*Klein* conspiracy" remains valid in light of *Ciminelli* and other intervening case law?

## STATEMENT OF THE CASE

### A.    Nature of the case and relevant procedural history.

Appellants manufactured and sold a trigger device called the FRT-15 that allows a person to fire a specific semi-automatic rifle quickly.[1] Appellants, based on personal knowledge, the pre-marketing advice of counsel and firearms experts, believe that their device does not satisfy the definition of a "machine gun" under federal law—which is not based on a gun's rate of fire—because the trigger functions for every shot fired.[2] A317-A320, Tr. 430:19-431:5, 432:13-433:9; A322-A323, Tr. 437:19-439:9.

---

[1] Appellants also later sold a substantially similar trigger device they did not manufacture called the Wide Open Trigger or WOT.

[2] A district court in the Northern District of Texas recently agreed with Appellants' conclusion that the FRT-15 is not a machine gun and rejected the underlying theory the ATF relies on in this matter. *See National Association of Gun Rights, et al. v. Garland, et al.*, Case No. 4:23-cv-00830-O, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) (granting plaintiffs a preliminary injunction). The Fifth Circuit refused to stay that district court's injunction against the Government, finding that the ATF wrongly viewed forced reset triggers as machineguns. *National Ass'n for Gun Rights v. Garland*, No. 23-11138 C.A. Doc. 12, at 79-91 (5th Cir. Nov. 17, 2023). In this appeal, Appellants are *not* asking this Court to decide which district court is correct about whether the FRT-15 meets the statutory definition of a machine gun. *Garland v. Cargill*, 144 S. Ct. 374 (2023), which is shortly to be heard by the Supreme Court, is likely, as a practical matter, either to decide or to provide substantial

Appellants therefore marketed and sold their device as one that does not qualify as a machinegun under federal law. A319, Tr. 432:5-15. This included publishing videos with an attorney and an expert explaining their interpretation of the law. A318, Tr. 431:10-22. After learning of the ATF's opinion that the FRT-15 was a machine gun, Appellants submitted information to the ATF and urged it to reconsider, sued the ATF repeatedly, hired a public relations firm, appeared in the media to defend their position, responded to customer inquiries with their legal interpretation, and, in the marketing for one product, stated that proceeds would be for legal defense costs to defend against what they perceived to be the ATF's erroneous opinion. A357, Tr. 548:5-17; A330-A331, Tr. 450:16-451:20; A92-A93 ¶¶ 3-5; A253.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") believes that the device does satisfy the definition of a "machinegun." A27 ¶ 7. Long after it became aware of Appellants' sale of the FRT-15 and opined that it was a machinegun, the Government brought this action alleging that Appellants had been defrauding customers by

---

guidage regarding the standard to be applied in deciding that question.

proclaiming their belief that it was not a machinegun and not telling customers of the ATF's contrary opinion. A44 ¶¶ 100, A58-A60 ¶¶ 200-15. It also raided the vendor manufacturing the FRT-15. The ATF thus also deprived Appellants of their manufacturer, which quickly ended Appellants' ability to sell FRT-15's. A360-A361, Tr. 583:24-584:12.

The Government contends that when Appellants launched their business, they were obligated to inform customers that the ATF could, in the future, conclude that the FRT-15 was a machinegun or, after the ATF notified Appellants of its opinion, that Appellants should have done even more to notify customers of the agency's opinion. A44 ¶¶ 100-02.

The Government further alleged that, after the ATF notified Appellants of its opinion that the FRT-15 was a machinegun and demanded they stop selling them, Appellants obstructed the ATF's lawful function regulating "machineguns," and thus engaged in an unlawful "*Klein* conspiracy," by (a) not discontinuing their pre-existing privacy policy of not retaining customer information, (b) using a pseudonym on packages they mailed when they contained valuable triggers (but shipping cheaper parts under the Rare Breed Firearms

6

name), and (c) retrieving additional inventory they had paid for from their manufacturer after the ATF's search warrant for the manufacturer had expired. A57-A58 ¶¶ 196-200; A385, Tr. 70:6-11.[3]

On January 19, 2023, the Government, *ex parte* and concurrent with the filing of its Complaint, moved for a TRO and a preliminary injunction. ECF No. 5. After granting the TRO on January 25, the district court held a preliminary injunction hearing on August 1 and 2, 2023. On August 15, 2023, the district court held oral argument on the Government's preliminary injunction motion. District Court Judge Nina R. Morrison thereafter granted the Government's preliminary injunction motion on September 5, 2023. A112-A240. And it is from that preliminary injunction order that Appellants appeal.

## B. Facts relevant to the issues submitted for review.

### i. *How the FRT-15 works compared to traditional semi-automatic rifles and machineguns.*

The FRT-15 is a "forced-reset trigger" that is designed to be installed in a semi-automatic AR-15 rifle in place of its original trigger mechanism. A303, Tr. 277:3-16. The difference between an FRT-15 and

---

[3] See also ECF No. 5 at 25-26

7

a standard semi-automatic trigger is how they reset the trigger after a shot is fired. A303-A305, Tr. 277:3-278:4, 278:22-279:24; A307-A309, Tr. 281:25-283:16.

In hammer-fired rifles like the semi-automatic AR-15 and its automatic version, the M-16, the mechanical function of the trigger is to release the hammer to strike the firing pin and fire a round. A298, Tr. 267:2-12; A302, Tr. 276:1-9. For semiautomatic rifles like the AR-15, the trigger must perform its mechanical function of releasing the hammer for every shot fired. A303-A305, Tr. 277:12-278:4. Between shots, the trigger must reset forward so that it retains the hammer again in preparation for the next shot. *Id.* If the trigger does not reset, it cannot retain the hammer and therefore another shot cannot be fired. *Id.*

In a traditional semi-automatic trigger, the trigger resets due to a return-spring that pushes the trigger forward to its reset position. A304-A305, Tr. 278:22-279:14. After the shooter fires a shot by moving the trigger rearward with his finger, the trigger resets when he reduces his finger pressure enough for the return spring to move it forward to its reset point where it once more retains the hammer. *Id.*

8

The difference between the FRT-15 and a traditional semi-automatic trigger is that, instead of a spring, the FRT-15 resets the trigger after a shot using mechanical force derived from the weapon's operation after a shot is fired. A303, Tr. 277:3-11. The FRT-15 otherwise works the same way as a traditional trigger, with 1) the same mechanical function of releasing the hammer when moved rearward far enough, A303, Tr. 277:12-16, 2) the same need for the trigger to reset forward to retain the hammer again between each shot—or else another shot cannot be fired, A303, Tr. 277:21-278:4, and 3) the same need for the trigger to release the hammer for each shot fired, A310-A311, Tr. 284:24-285:8. The shooter must still move the trigger rearward to release the hammer for each shot. A303, Tr. 277:3-11. The advantage provided by the FRT-15 over a traditional semi-automatic trigger is that it allows a shooter to fire much faster because the mechanical reset enables the shooter to move the trigger rearward sooner after each shot. A306-A307, Tr. 280:22-281:6.

By comparison, the M-16's trigger has the same mechanical function of releasing the hammer as the semi-automatic trigger in the AR-15, but an M-16 set to automatic fire (an ability that qualifies the

9

M-16 as a machinegun) only needs to release the hammer once to fire

the first shot before a separate component called an auto-sear takes

over to retain and release the hammer to fire all subsequent shots.

A299, Tr. 272:2-11. Unlike the traditional AR-15 or the FRT-15, the

trigger only releases the hammer once during an M-16's automatic fire

(for the first shot) and does not need to reset in order to re-release the

hammer for subsequent shots. *Id.*

### ii. Appellants marketed the FRT-15 as legal based on their understanding that it does not satisfy the statutory machinegun definition.

Appellants began their business in May 2020 with the

incorporation of their business, Rare Breed Triggers ("RBT"), and the

purchase of the patent for the FRT-15 from its inventor, Jeffrey Cooper

Rounds. A315-A316, Tr. 420:7-421:5; A348, Tr. 492:19-24; A355, 539:4-

8; A362-A363, 588:25-589:3; A246-A248. After acquiring the FRT-15's

patent in May 2020, Appellants solicited expert opinions to assess

whether it was a legal semi-automatic device or, instead, a machinegun

conversion device. A317-A318, Tr. 430:19-431:4; A356, Tr. 543:3-5.

Appellants ultimately obtained the opinions of four former ATF

personnel, all of whom were firearms experts and one of whom was also

10

an attorney. A317-A318, Tr. 430:19-431:5; A356, Tr. 543:3-5. They, in addition to Appellant Kevin Maxwell, an attorney, evaluated the FRT-15 based on knowledge of firearms and their function, machineguns, and the law defining machineguns. A317-A318, Tr. 430:19-431:5; A356, Tr. 543:3-5.

These experts all agreed that the FRT-15 was a legal device and not a machinegun based on their understanding of firearms and the statutory machinegun definition established by the National Firearms Act and Gun Control Act. A323-A324, Tr. 438:18-439:9. Despite his expert opinion being that the FRT-15 was legal and not a machinegun on the merits, one of the experts, Dan O'Kelly, predicted the ATF would likely incorrectly claim the FRT-15 is a machinegun and that Appellants would have to fight the ATF on its position. A314, Tr. 370:14-15.

In December 2020, Appellants began selling the FRT-15. A349, Tr. 493:12-13. Confident in their belief that the FRT-15 did not meet the statutory definition of a machinegun due to their understanding of its operation based on their own experience in the firearms industry and their experts' analysis, Appellants marketed the FRT-15 as a legal

11

product and not a machinegun. A319-321, Tr. 432:5-434:8. They published videos explaining their position that the FRT-15 is legal, including a video of Appellant Maxwell (who is an attorney) explaining why the FRT-15 is a legal semi-automatic trigger based on the text of the statutory definition and the trigger's function, A135, and an interview between Appellant DeMonico and Dan O'Kelly explaining why O'Kelly believed the FRT-15 is not a machinegun, A136; A318, Tr. 431:7-22. After launching the FRT-15, Appellants received a large volume of emails asking whether the FRT-15 was legal, to which they provided their opinion that it is. A346-A347, Tr. 478:22-479:7.

### iii.  The privacy policy.

When Appellants set up their online store for selling FRTs in December 2020, they opted-in to their e-commerce service provider's option to have the identifying information in their customer's digital sales records automatically anonymized after about two weeks. A325-A326, Tr. 442:1-443:17. They chose this option to protect their customers' privacy and to protect their business and customers from hackers or security breaches. A325-A326, Tr. 442:1-443:24. The policy's

purpose was not to hide information from the government. A327, Tr. 444:7-9.

### iv. *Cease-and-desist letter and Appellants' disagreement with the ATF.*

On July 27, 2021, the ATF served Appellants with a cease-and-desist letter stating the ATF's opinion that the FRT-15 is a machinegun. A259-A260. The ATF's letter came after the ATF examined an example of the FRT-15 and stated that it is a machinegun because it enables the shooter to fire more than one round without releasing his finger pressure on the trigger between shots (due to the mechanical reset obviating the need to do so). A372-A373, Tr. 216:12-217:2; A374-A375, Tr. 219:19-220:1. The cease-and-desist instructed Appellants to cease manufacturing and transferring FRT-15s and to contact the ATF to address the FRT-15s that had already been sold. A259-A260.

Based on Appellants' disagreement with the ATF's position and their belief in the FRT-15's legality under the statutory definition, Appellants filed a lawsuit against the ATF in the United States District Court for the Middle District of Florida in August 2021, seeking a declaration that the ATF's classification was erroneous and an

13

injunction against the ATF's interference with Appellants' FRT-15 sales. A275, A291. It was only after Appellants filed this suit that the ATF provided them a copy of the classification report as part of the litigation. Tr. 595:19-596:2.[4] Appellants also launched a media campaign publicizing their disagreement with the ATF's position on the FRT-15 and their lawsuit against the ATF. A347, Tr. 548:5-17; A330-A331, Tr. 450:16-451:20; A92-A93 ¶¶ 3-5. The lawsuit was dismissed for procedural reasons in October 2021. *See* A257-A258.

In November 2021, Appellants submitted their experts' opinion letter and other materials to the ATF in a request for reconsideration of its reclassification. A295-A296, Tr. 249:24-250:22; A297, Tr. 252:3-9. The ATF failed to respond to Appellants' materials and explanation of their position on the FRT-15's legality. A364-A365, Tr. 598:19-599:8.

Appellants would later file a second lawsuit against the ATF in May 2022, this time in the United States District Court for the District of North Dakota (where Appellants had recently reincorporated), but this lawsuit too was dismissed for procedural reasons. A354, Tr. 516:17-

---

[4] The ATF refused to provide the classification report explaining its analysis until Appellants' filed litigation and motion practice ensued. ECF No. 142, Tr. 595:20-24.

14

23. *See Rare Breed Triggers, LLC v. Garland*, 22-cv-85, 2022 WL 17175089 (D.N.D. Nov. 4, 2022).

### v. *The ATF raids Appellants' manufacturer.*

On March 24, 2022, approximately 8 months after serving Appellants with their cease-and-desist letter, the ATF obtained a warrant to search the premises of Appellants' manufacturer, 3rd Gen Machine ("3rd Gen.") and seize FRT-15s and related components and documents. A73. The warrant's expiration date was April 7, 2022. *Id.* On March 26, 2022, the ATF raided 3rd Gen., seizing FRT-15s, component parts, and computers. A350-A351, Tr. 506:23-507:1; A74 ¶ 2. After the raid, 3rd Gen. received a new pallet of FRT-15s at the facility. A333-A334, Tr. 457:22-458:7; A88-A89 ¶ 10. After receiving the pallet, 3rd Gen. contacted the ATF, offering to voluntarily surrender the FRT-15s it had received. A74-A75 ¶¶ 3-4.

Having paid for the pallet's worth of product and wishing to receive it, Appellants asked 3rd Gen. to send it to them, which 3rd Gen. refused to do. A104-A105, Tr. 175:21-176:4. Despite 3rd Gen.'s offer, the ATF did not retrieve the pallet of FRT-15s belonging to Appellants before the warrant expired on April 7, 2022. A335-A336, Tr. 459:21-

460:6. Moreover, while the ATF did nothing, RBT's property, worth hundreds of thousands of dollars and allegedly comprising thousands of machineguns, was left unsecured in 3rd Gen.'s parking lot. A335-A336, Tr. 459:6-14, 459:21-460:6,

### vi. *Appellant DeMonico retrieves RBT's property at 3rd Gen. after the ATF's warrant expired.*

After 3rd Gen.'s refusal to deliver Appellants' product to them, Appellant DeMonico waited three weeks until he was confident that the ATF's warrant on the FRT-15s at 3rd Gen.'s facility had expired and went to retrieve RBT's property on April 14, 2022. A335-A336, Tr. 459:21-460:6; A337, Tr. 461:13-17; A338, Tr. 462:5-15. DeMonico felt confident that the warrant had expired because he knew "they can't last for months" and that enough time had likely elapsed. A338, Tr. 462:5-15. He was right.

When DeMonico arrived at 3rd Gen., he told them of his intention to retrieve RBT's property and then loaded the products in a rented U-Haul and departed. A336-A337, Tr. 460:10-461:12. After DeMonico had driven for some time, the ATF stopped him along the road and seized the FRT-15s and related components in his possession before letting him go without an arrest. A339-A343, Tr. 464:15-465:6, 467:14-468:2.

16

### vii. *Appellants use a discreet shipping practice to avoid theft from their customers.*

In October 2022, Appellants received an inventory of a copy-cat product of the FRT-15 called the Wide Open Trigger ("WOT"). A361, Tr. 584:13-16; A106 ¶ 3. When shipping the WOTs, Appellants used alternative names on the packaging; instead of "Rare Breed Triggers," the packages had other names using the same three initials, such as "Red Barn Tools" and "Red Beard Treasures." A328-A329, Tr. 445:20-446:3; A344-A345, Tr. 476:23-477:6; A97-A103, Tr. 91:9-92:4, 93:23-94:2. Though the names were different, the return address on all the packages was still RBT's address in Fargo, North Dakota: 3523 45th Street South, Suite 100, Fargo, North Dakota 58104. A98-A99, Tr. 92:18-93:2; A66, A69; A328-A329, Tr. 445:20-446:3.

Appellants used this discreet shipping practice to deter package thieves, also known as "porch pirates," who would otherwise be enticed to steal the packages from customers' porches because the name "Rare Breed Triggers" would indicate they contained easily-moved, high value items attractive to thieves. A97-A98, Tr. 91:25-92:14. This issue arose when Appellants switched to shipping with USPS from UPS to lower costs when selling the lower-value, lower-priced WOTs. A106-A107 ¶¶

17

3-7. While USPS was cheaper, its service was worse: USPS would consistently deliver without requiring a customer signature or would otherwise expose packages to loss or theft, and its package insurance was not reliable. *Id*. ¶¶ 5-7; A97-A98, Tr. 91:18-92:14; A328, Tr. 445:2-19. Because of these issues, Appellants used discreet shipping to avoid the cost of lost or stolen packages by making their packages appear less appealing to thieves. A328-A329, Tr. 445:20-446:7; A107-A108 ¶¶ 8-11. This is not a novel idea: At least one major firearms manufacturer, Genesis Arms, ships its high-end shotguns (worth about $5000 each) in boxes that state they contain brooms. A108 ¶13, A111.

Though they changed the name when shipping WOTs, Appellants continued to use Appellant Rare Breed Firearms' name on other packages containing inexpensive items like springs that they did not mind replacing if lost or stolen. A108 ¶ 12; A343, Tr. 512:5-13.

## SUMMARY OF ARGUMENT

1. The Government alleges that the Appellants violated 18 U.S.C. § 371, which prohibits persons from "conspir[ing] either to commit any offense against the United States, or to defraud the United States, or any agency thereof." A *Klein* conspiracy is a judicially-created form of a

18

section 371 conspiracy, one "for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 861 (1966). To prove a *Klein* conspiracy, the Government must show that Appellants 1) entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) committed at least one overt act to further the conspiracy. *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996).

The Government failed to establish that it was likely to prove the Appellants had the requisite intent to commit a Klein conspiracy, and specifically that the Appellants intended to and that as a matter of law and fact the actions Appellants took were in furtherance of the alleged *Klein* conspiracy.

2. For the Government's mail and wire fraud claims, it had the burden of proving that Appellants made material misrepresentations with the requisite fraudulent intent. That is, that they made a statement to customers they knew to be false. The district court held that Appellants had a fraudulent intent because they represented to customers that they believed FRT-15 was not a machinegun, which the

19

court concluded was a knowingly false statement only because Appellants anticipated, and later learned, the ATF's opinion that the FRT-15 is a machinegun. The court thus erred as a matter of law because it repeatedly equated whether a device was in fact illegal with whether the ATF opined, or could be expected to opine, that it was illegal.

3. The United States' theory of mail and wire fraud also effectively amounts to a reapplication of the "right-to-control" theory that was rejected by the United States Supreme Court in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023). *Ciminelli* rejected the "right-to-control theory" of fraud. That is, no finding of fraud can exist when the putative victim was "'deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets.'" *Id.* at 1126. The United States simply argues that buyers would have considered it valuable to know additional information about the purported history of the FRT-15 before purchasing one.

4. *Ciminelli* also reaffirmed the basic approach to statutory interpretation that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." *Id.* at 1124. This

20

holding forecloses the Government's claim of a *Klein* conspiracy because the object of the alleged conspiracy was not to deprive the government of a property interest but instead to "impair or impede" governmental functions.

## ARGUMENT

### I. Standard of review.

As the court's analysis has errors of both law and fact, the standard of review for its decision to grant a preliminary injunction is bifurcated. The court's errors of law are reviewed de novo. *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015). Its errors of fact are reviewed for abuse of discretion. *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003).

A district court abuses its discretion to grant a preliminary injunction "when [] its decision rests on . . . a clearly erroneous factual finding." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." *Anderson v City of Bessemer City, N.C.*, 470 US 564, 573 (1985).

## II. The district court's finding that Appellee has satisfied its burden to demonstrate it would likely prove at trial that Appellants engaged in a *Klein* conspiracy is errant both legally and factually.

The Government alleges that Appellants violated 18 U.S.C. § 371, which prohibits persons from "conspir[ing] either to commit any offense against the United States, or to defraud the United States, or any agency thereof[.]" A57 ¶¶ 195-199. The Government specifically alleged the Appellants engaged in a *Klein* conspiracy to defraud the ATF. A57 ¶ 196.

A *Klein* conspiracy is a judicially-created variety of conspiracy, one "for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 861 (1966). To prove a *Klein* conspiracy, the Government must show that Appellants 1) entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) committed at least one overt act to further the conspiracy. *United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020). The court characterized the alleged Klein conspiracy as "a conspiracy to obstruct

22

the ATF's lawful jurisdiction to investigate Appellants' manufacture and distribution of illegal machineguns." A231.

The Government alleged that Appellants undertook just three actions in furtherance of the alleged Klein Conspiracy: (A) Appellants mailed packages containing high value products using a pseudonym for their company's name, though accurately reflecting its address; (B) Appellants had a policy of not keeping customer information longer than required to handle product returns, and did not alter this policy after the ATF notified Appellants of its opinion that the FRT-15 was a machinegun or raided Appellants' manufacturer vendor; and (C) Appellant DeMonico took possession of FRT-15s belonging to Appellants that came into the possession of Appellants' manufacturing vendor after the ATF executed a search warrant on the vendor, and after that warrant had expired.

Here, the district court's analysis contained errors of law and clearly erroneous factual findings as to these three actions and the alleged *Klein* conspiracy overall.

**A.  Appellants' customer privacy policy is not evidence of a Klein conspiracy as a matter of law because it violated no legal duties and did not involve submitting false information to the Government.**

23

Long before the ATF analyzed an FRT-15, longer before it issued its non-binding cease and desist letter, and even longer before the ATF raided 3rd Gen., Appellants had a routine practice of not retaining customer records longer than required to handle product returns. A325-A326, Tr. 442:1-443:24.

The court found that Appellants' customer privacy policy was likely an act of dishonesty used to impair the ATF's regulation of FRTs because Appellants did not discontinue the policy after either the July 2021 cease-and-desist letter or the March 2022 raid on 3rd Gen and because two customer emails reflected those customers' desire not to have their information shared with the ATF. A224-A225. The court's finding is an error of law because Appellants' decision to maintain their clients' privacy by not maintaining customer records and refusing to voluntarily disclose customer information absent a legal duty cannot constitute a dishonest act as part of a *Klein* conspiracy.

The third element of a *Klein* conspiracy is that it must be accomplished by "dishonest means" or "trick, deceit, [or] chicane." *Hammerschmidt v. United States*, 265 U.S. 182, 188–89 (1924). This

24

Court has described the meaning of "dishonest" for purposes of a *Klein* conspiracy:

> We agree with the BIA that the Black's Law Dictionary definition of "dishonest" comports with the Court's broad reading in *Kawashima* of fraud and deceit under § 371: it provides that a person is "dishonest" when he displays "a lack of integrity or probity ... and therefore [a] tend[ency] to cheat people," and that a "dishonest" action is one "not involving straightforward dealing; discreditable; underhanded; fraudulent." Dishonest, Black's Law Dictionary (11th ed. 2019), available through Westlaw. Accordingly, we conclude that the crime described in the defraud clause of § 371 and to which Rodden pleaded guilty categorically involves fraudulent and deceitful conduct.

*Rodden v. Wilkinson*, 845 F. App'x 25, 27 (2d Cir. 2021). Key to the element of dishonesty is either employing a falsehood against the government or the subversion of a legal duty of some kind, and courts have repeatedly rejected *Klein* conspiracy claims where the defendants' conduct involves neither. *See United States v. Murphy*, 809 F.2d 1427, 1431-32 (9th Cir. 1987) ("Murphy and his co-defendants had no duty to disclose the source of the deposited funds. Where the regulations implementing the Act do not impose a duty to disclose information, failure to disclose is not conspiracy to defraud the government."); *United States v. Porter*, 591 F.2d 1048, 1055–58 (5th Cir. 1979) (rejecting a *Klein* conspiracy charge that failed to identify any duty imposed by a

25

statute or regulation which prohibited the defendants' supposedly dishonest acts); *United States v. Caldwell*, 989 F.2d 1056, 1061 (9th Cir. 1993) (stating that a defendant who preserved her clients' financial secrets, including from the IRS, by "promis[ing] to keep no records of clients' transactions and vow[ing] not to disclose information about the accounts to third parties," and who "helped [her] customers avoid paying taxes," would need to have "fail[ed] to file required reports" or "ma[de] false statements to the government" to have engaged in a dishonest act for *Klein* purposes).

In *Caldwell*, the Ninth Circuit directly suggested that a dishonest act for a *Klein* conspiracy must be either a direct falsehood given to the government or the violation of a specific law. *Caldwell*, 989 F.2d at 1061.

Appellants' customer privacy policy tracks nearly exactly with the defendant's conduct at issue in *Caldwell*. There, the defendant was a bookkeeper who maintained her client's financial privacy by promising not to keep records of their transactions and vowing not to disclose their information. *Caldwell*, 989 F.2d at 1056. In analyzing the lower court's failure to require a finding that the defendant had obstructed the

26

government in a dishonest manner, the Ninth Circuit suggested that the government would have to show the defendant had failed to file reports or had made false statements to the government because merely preserving her clients' privacy and not disclosing records to the government absent a legal duty could not suffice. *Id.* at 1061. The Ninth and Fifth Circuits have also found that dishonesty for a *Klein* conspiracy requires falsehoods or violation of a legal duty. *See Murphy*, 809 F.2d at 1431-32; *Porter*, 591 F.2d at 1057.

Here, the court erred by finding that Appellants' continuing their customer privacy policy after the cease-and-desist letter and after the 3rd Gen. raid was sufficient evidence the policy was likely to dishonestly impair the ATF. A224-A225. But the court did not find that the policy involved any falsehoods submitted to the government or any violations of a legal duty to disclose the records covered by Appellants' policy. Nor could it have. The court states that Appellants likely knew the records were helpful to the ATF's investigation, but the court identifies no request or demand for those records that was violated by the customer privacy policy. *Id.*

27

Because the court does not identify any falsehoods or violation of a legal duty related to the policy, it erred as a matter of law in finding that it was an act of dishonesty impairing the ATF's investigation.

**B.    The Court's factual finding that Appellants' customer privacy policy is evidence of a Klein conspiracy was clearly erroneous because there was no evidence Appellants had a duty to preserve or disclose their customer records.**

Even should the Court find that the district court did not err as a matter of law in finding that Appellants' customer privacy policy was evidence of a *Klein* conspiracy absent either falsehood or violation of a legal duty, the court's finding was clearly erroneous because it was based on insufficient evidence. In *United States v. Coplan*, the Court found that an accountant's participation in a company "policy of discouraging personnel from leaving PowerPoint slides and other marketing materials with clients, in case the IRS should demand copies of those materials from the client during an audit," was insufficient evidence of a *Klein* conspiracy because the Government did not argue "that the IRS ever requested copies of the promotional materials held in [the company's] own files, or that governing ethical standards required

[the company] to disclose those materials in the absence of such a request." 703 F.3d 46, 64 (2d Cir. 2012).

Here, the court found that Appellants' customer privacy policy was evidence of a *Klein* conspiracy because Appellants were aware that the ATF *would benefit from* the customer information Appellants chose not to retain, and they continued not to retain it anyway. A224-A225. The court inferred that Appellants' policy was likely for dishonest purposes because it found, inaccurately, that Appellants "became aware that the information in their sales data was the subject of an official investigation by the ATF" after they received the July 2021 cease-and-desist letter. A224. The court's conclusion was clearly erroneous because the letter itself did not mention Appellants' sales records, instruct them to impose a litigation hold, or otherwise mention *any* of Appellants records generally, for sales or otherwise. A259-A260. Contrary to the court's analysis, the cease-and-desist letter did not put Appellants on notice that the ATF had an interest in, much less a right to, their customer sales data. This ATF letter was not a subpoena. As the court acknowledged, the letter was non-binding and had no legal effect. A217.

29

Furthermore, the only mention of an investigation was the letter's warning that, if Appellants did not voluntarily cooperate with the ATF's demands, it "*may* result in (1) law enforcement action by ATF, including a referral of this matter to the United States Attorney's Office for criminal prosecution; (2) tax assessment and collection; and/or (3) seizure and forfeiture of the firearms and property involved in violations of Federal law." A260 (emphasis added).

Just as the *Coplan* defendant's decision not to disclose promotional materials to the IRS without a duty or request was not evidence of dishonest intent to impair a lawful government function, neither is Appellants' decision not to change their pre-existing policy for preserving their customers' privacy and data security in response to a non-binding letter that did not ask for records and had no legal effect.

The court's finding that Appellants failure to change their existing customer privacy policy after the March 2022 raid was further evidence of a *Klein* conspiracy is erroneous for the same reason. *See* A225. Appellants still had no request for their records and no obligation to change their customer privacy policy. At no point after the raid did the ATF execute a warrant on the Appellants or serve a subpoena; nor was

30

there any other demand, duty, or reason for them to discontinue their customer privacy policy.

The court also erred in finding that some of Appellants' emails with customers were evidence of their dishonest intent. This inference was based on a mischaracterization of those emails. The court claimed that in RBT's emails "RBT explained to its customers that it employed a digital shredding policy *specifically* to prevent customer data from ending up in the hands of the ATF," A224 (emphasis added), but the two emails the court relied on show no such thing, A261; A249. In each of these emails, it is *the customers*, not Appellants, that refer to concerns about the ATF acquiring their information. *Id.* In each email, Appellants merely acknowledge that a consequence of their customer privacy policy is that they would not have records available to turn over in response to a request and that they would not voluntarily "hand over anything to anyone." *Id.* Appellants' response mirrors the company policy in *Coplan*. For the same reason, the court's finding that Appellants' emails affirming they would neither maintain nor disclose records absent an obligation were evidence of dishonest intent was clearly erroneous.

31

**C.** **The court erred as a matter of law in finding Appellant DeMonico's retrieval of RBT's property from 3rd Gen. was evidence of a *Klein* conspiracy because it failed to identify how this act involved falsehoods provided to the government or the violation of a specific legal duty.**

For the same reasons its finding regarding Appellants' privacy policy was erroneous, the court erred as a matter of law in concluding that Appellant DeMonico's trip to 3rd Gen. to retrieve RBT's property was evidence of a dishonest act impairing the ATF's investigation without finding that it involved any falsehoods or violation of a legal duty. *See* A229-A230. The court does not identify any falsehoods or deceit involved in DeMonico's conduct, nor any legal duties he violated. To the contrary, DeMonico's conduct was the opposite of deceitful: he showed up at 3rd Gen., let them know he was there for RBT's property, loaded it up, and drove away. A336-A337, Tr. 460:3-461:12.

Nor did it breach any legal duty of Appellants or any other person, or a right of the ATF, inasmuch as the court acknowledged that the warrant on the location in question had expired a week before DeMonico's trip. A227. The court also acknowledged that 3rd Gen.'s offer of the pallet to the ATF was voluntary, not compelled. A229. Thus, the ATF had no right to RBT's property at 3rd Gen. without a valid warrant.

32

*United States v. McCargo*, 464 F3d 192, 196 (2d Cir. 2006) (property seizure without a warrant is presumptively unreasonable).

The court concluded that DeMonico's conduct impaired the ATF, and that is precisely what the Government argued at closing arguments as well. A229; A244-A245, Tr. 73:1-74:13. But merely impairing a government function does not suffice for proving a *Klein* conspiracy. The Ninth Circuit vigorously warned about how harmful expanding *Klein* conspiracy in this manner would be:

> There are places where, until recently, "everything which [was] not permitted [was] forbidden.... [W]hatever [was] permitted [was] mandatory.... Citizens were shackled in their actions by the universal passion for banning things." *Yeltsin Addresses RSFSR Congress of People's Deputies,* BBC Summary of World Broadcasts, Apr. 1, 1991, *available in* LEXIS, Nexis Library, OMNI file. Fortunately, the United States is not such a place, and we plan to keep it that way. If the government wants to forbid certain conduct, it may forbid it. If it wants to mandate it, it may mandate it. But we won't lightly infer that in enacting 18 U.S.C. § 371 Congress meant to forbid all things that obstruct the government, or require citizens to do all those things that could make the government's job easier. So long as they don't act dishonestly or deceitfully, and so long as they don't violate some specific law, people living in our society are still free to conduct their affairs any which way they please.

*Caldwell*, 989 F.2d at 1061.

The court's finding that DeMonico impaired the ATF's investigation simply because he prevented a third party from giving away RBT's property to the ATF without either RBT's permission or a valid warrant effectively imposed an obligation on Appellants to surrender their property to the ATF without a warrant in violation of their Fourth Amendment rights. Part of the ATF's lawful function is complying with warrant requirements and other procedures that protect suspects' constitutional rights. *Berger v. State of N.Y.*, 388 U.S. 41, 62-63 (1967) ("[W]e cannot forgive the requirements of the Fourth Amendment in the name of law enforcement. . . . While '[t]he requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement,' it is not asking too much that officers be required to comply with the basic command of the Fourth Amendment . . . ." (quoting *Lopez v. United States*, 373 U.S. 427, 464 (1963) (internal citation omitted))).

The district court's interpretation of *Klein* would nullify those protections by making it unlawful for a person to resist the ATF's warrantless desire for their property. Because the court's standard violates the Fourth Amendment and because DeMonico's conduct does

34

not constitute a dishonest act for *Klein* purposes, the court erred as a matter of law in finding that DeMonico's trip to 3rd Gen. was likely an act of dishonesty meant to impair the ATF's investigation.

> **D.  The court's finding that DeMonico intended to unlawfully impair the ATF's investigation by retrieving RBT's property from 3rd Gen. was clearly erroneous without evidence that he believed the ATF had a right to seize it.**

The court erred in finding that DeMonico intended to unlawfully impair the ATF's investigation when he retrieved RBT's property from 3rd Gen.'s open parking lot. A229-A230. The court's factual finding is clearly erroneous because there was insufficient evidence for the court to find DeMonico likely intended to impair the ATF's lawful function.

DeMonico testified without contradiction that he believed that the warrant the ATF executed on 3rd Gen. had expired by the time he went to retrieve Appellants' property there. A337-A338, Tr. 461:13-17, 462:5-15. DeMonico testified that he "felt confident that [the] time period had expired" for the warrant because several weeks had passed since the raid and warrants "cannot last forever." A338, Tr. 462:5-15.

And he was *right*. The warrant was issued on March 24, 2022, and it expired on April 7, 2022—a full week before DeMonico went to 3rd Gen. on April 14, 2022. A73; A352, Tr. 508:4-8.

Despite DeMonico's testimony and the accuracy of his belief about the warrant's expiration, the court found that he likely had a dishonest intent because he was likely "fully aware that the ATF intended to retrieve [the] pallet of triggers" because 3rd Gen. informed Appellant Maxwell on March 30, 2022, that 3rd Gen. intended to give RBT's triggers to the ATF. A229; A255-A256.

The court's reasoning is clearly erroneous because even if DeMonico had been aware that the ATF wanted Appellants' triggers and intended to accept 3rd Gen.'s gratuitous offer to provide them to the ATF, this would not mean that DeMonico believed that the ATF had a right to seize the triggers or that 3rd Gen. had either a duty or a right to surrender them to the ATF without a valid warrant. There is simply *no* evidence establishing that DeMonico erroneously and subjectively believed the ATF had a warrant for RBT's property that he would have been interfering with.

36

The court even acknowledges that 3rd Gen.'s offer to the ATF was to "voluntarily surrender" the FRT-15's on its lot. A229. 3rd Gen.'s proposal to the ATF was specifically *voluntary*, and so the Appellants would have been aware that the ATF would be retrieving the triggers without a valid warrant.

As the only available evidence shows that DeMonico did not believe that the ATF had an enforceable right to RBT's property at 3rd Gen. when he retrieved it, and he was right, the court's finding that he intended to impair the ATF's investigation by interfering with a warrant when he retrieved Appellants' property is clearly erroneous.

**E. The district court's factual finding that RBT's discreet shipping practice was a scheme to defraud the ATF is clearly erroneous because it was based on illogical, implausible, and self-contradicting inferences.**

The district court found that the Appellants' discreet shipping practice was likely a means for preventing the ATF from tracking and intercepting their shipments of WOTs, but the court's conclusion is based on inferences that are either unsupported or directly contradicted by the evidence. *See* A218-A223.

Appellants received an inventory of WOTs, which are knockoff FRT-15s, well after the ATF's cease and desist. A361, Tr. 584:13-16;

37

A106 ¶ 3. They began shipping the WOTs using alternative names on the packaging. A218-A219. Instead of using "Rare Breed Triggers" on the packages, they used other names with the same initials, such "Red Barn Tools" and "Red Beard Treasures." *Id*. Though the names were different, the return address on all the packages was still RBT's address in Fargo, North Dakota: 3523 45th Street South, Suite 100, Fargo, North Dakota 58104. A98-A99, Tr. 92:18-93:2; A66, A69; A328-A329, Tr. 445:20-446:3.

Appellants used this discreet shipping practice to deter package thieves, also known as "porch pirates," who would otherwise be enticed to steal the packages from customers' porches because the name "Rare Breed Triggers" would indicate they contained easily moved, high-value items that could easily be stolen. A100-A101, Tr. 91:25-92:14. Appellants used discreet shipping to avoid the cost of lost or stolen packages by making their packages appear less appealing to thieves. A328-A329, Tr. 445:20-446:7; A107-A108 ¶¶ 8-11. This is not uncommon in the industry. For example, a major firearms manufacturer, Genesis Arms, ships its high-end shotguns in boxes that

omit its own full name and falsely state that they contain brooms. A108 ¶13, A111.

Significantly, though Appellants changed the name on the label when shipping WOTs, they did not change the name on their account or on the packaging for inexpensive spare parts like springs that they did not mind replacing if lost or stolen. A108 ¶ 12; A353, Tr. 512:5-13. Accordingly, this policy was not part of a scheme to conceal Appellant's business address, or to conceal the identities and locations of its customers, from anyone who may have undergone the effort to examine Appellants' mail. The determining factor was the value of the item in the package, consistent with Appellants' explanation that the policy was a loss prevention measure.

The court rejected Appellants' explanation and speculated that the discreet shipping practice was likely for the purpose of preventing the ATF from tracking and intercepting packages containing the Appellants' WOTs instead. A219. The court based its conclusion on four inferences that are either unsupported by the evidence or directly contradicted by it.

In *Coplan*, this Court found that evidence for *Klein* conspiracy convictions was insufficient where a good-faith explanation for the defendant's conduct was as likely and plausible as the Government's explanation that it was intended to dishonestly impair a government function. *See U.S. v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012). There, the Court concluded that there was insufficient evidence that an accountant had engaged in a *Klein* conspiracy to impede the IRS where the innocent explanations for his conduct were as plausible as the guilty explanations and where he made deliberate decisions in undertaking some of his allegedly dishonest actions that made them less effective for their supposed dishonest purpose. *Id.* at 63-67.

Here, the court clearly erred because there is insufficient evidence that Appellants' intent in using the common practice of discreet shipping was to impair the ATF rather than deter thieves; all circumstantial evidence of how Appellants employed discreet shipping either supports their innocent explanation or "gives equal or nearly equal circumstantial support to a theory of guilty and a theory of innocence." *Id.* at 72.

First, the court found that the Appellants likely used discreet shipping when using USPS because they were aware the ATF could track and seize their packages with USPS and wanted to hide their packages.[5] A219. This suggestion is self-contradicting. If Appellants were aware that the ATF could track and seize their packages if they used USPS and wanted to prevent this, their motivation would have been *to continue using UPS*, not switch to USPS and try a discreet shipping scheme for the first time. Assuming Appellants were aware the ATF could seize their packages with USPS, their decision to use USPS anyway is evidence they *did not* intend to hide from the ATF.

As well, Appellants conducted their discreet shipping in a manner that made their packages easy for the ATF to track and which circumstantially indicates they had no deceptive purpose: 1) they used their real company address on all packages, which presumably the USPS or ATF can track, 2) they used names with the same initials as their company, and 3) they shipped spare parts under their real company name—which would have led the ATF directly to customers

---

[5] There was no evidence presented that Appellants' practice would or did hinder the ATF's ability to track or intercept packages.

41

who had previously purchased WOTs. A328-A329, Tr. 445:30-446:3;
A353, Tr. 512:5-13. Shipping low-value parts to their customers using
their actual name makes no sense if there was a scheme in play to hide
themselves or owners of FRT-15's from the ATF but makes perfect
sense if the reason was economic.

The court's other reasons are similarly weak or lend themselves
equally or more to an innocent explanation. The court claims
Appellants' explanation that they started using discreet shipping
because they had more problems with USPS is undermined by customer
emails showing some lost packages and other issues occurred with UPS.
A221. But the court relied on no figures or statistics showing the rate of
issues were comparable between the carriers. There is no basis for the
court to find that the mere existence of *some* problems with UPS means
Appellants experienced no difference in switching to USPS.

The court also found that the Appellants' choice of "Red Beard
Treasures" as an alternative name undermined their explanation
because the word "treasure" on the packages would have indicated to
thieves that they contained something of value. A221. But the court's
only basis for this inference is its own speculative business judgment.

42

Appellants could just as well have thought "Red Beard Treasures" indicated to a potential thief that a package likely contained cheap pirate-themed tchotchkes or beard care products. The court has no evidence showing its explanation for the name is more likely than an innocent explanation.

Finally, the court found that Appellants' first using discreet shipping after the ATF "escalated" its enforcement measures with the March 2022 raid was evidence of their dishonest intent. A221-A223. But this is undermined by Appellants not using discreet shipping at all after the July 2021 cease-and-desist letter when they were still shipping FRT-15s through UPS. *See* Tr. 445:2-446:3; ECF No. 136 ¶¶ 3-4. After the July 2021 cease-and-desist letter and the Appellants publicization of their dispute with the ATF, their sales "exploded." A331, Tr. 451:17-24; A358, Tr. 549:13-22; A211 n.41. As well, the court's inference is further undermined by Appellants designing their discreet shipping practice in a manner that was ill-suited to hide their location or customers, as previously discussed. There was no evidence presented that the ATF tried to track or intercept Appellants' packages based on

the shipper's name or that the ATF was hindered in any way by Appellants' discreet shipping practice.

As all the circumstantial evidence regarding Appellants' intent behind their discreet shipping practice gives either equal or superior weight to an innocent explanation, the court's finding that the discreet shipping practice was likely evidence of their *Klein* conspiracy was clearly erroneous.

### III. The court's finding of mail and wire fraud should be reversed because the court erroneously equated Appellants' mere disagreement with the ATF's opinion, or anticipated opinion, with a fraudulent intent.

The Government alleged that Appellants engaged in mail and wire fraud when they told customers their belief that the FRT-15 was not a machinegun. A44 ¶ 100; A58-A59 ¶¶ 200-215. The district court erred as a matter of law when it found that Appellants intended to defraud their customers with this statement merely because Appellants disagreed with the ATF's opinion about FRT-15s, or anticipated a disagreement with an opinion the ATF would form in the future.

The court's error cuts to the heart of a citizen's right to dissent and aggrandizes the ATF's authority far beyond its statutory limits. The ATF does not have the power to unilaterally and conclusively

44

declare any gun to be illegal and it does not have the privilege of presumed infallibility—indeed in recent years its opinions have been repeatedly reversed when subjected to judicial review and it has reversed its own opinions *sua sponte*.[6]

Thus, citizens anticipating or hearing yet another erroneous and overreaching ATF opinion with which they disagree cannot, for that reason alone, be deemed to "know" that their dissenting speech is "false."

---

[6] *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (ATF's bump stock ban reversed); *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) (ATF's classification of FRTs as machineguns likely to be found arbitrary and capricious); *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) (ATF's expansion of "firearm" and "frame or receiver" to weapon part kits exceeded its authority); *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) (ATF's pistol brace likely to be set aside as unlawful); *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019) ("The ATF's interpretation of 'machinegun' gives anything but fair warning—instead, it does a *volte-face* of its almost eleven years' treatment of a non-mechanical bump stock as not constituting a 'machinegun.'") (Henderson, J., concurring in part and dissenting in part); *Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021) ("When an agency plays pinball with a statute's interpretation, as the ATF has here, fair notice cannot be said to exist.") (Tymkovich, C.J., dissenting) *see also* Final Rule, *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018) (reversing the ATF's decade-long position that non-mechanical bump stocks are not machineguns).

45

The district court's attribution of a fraudulent intent based on disagreement with the government's opinion would usher in unfathomable abuses and it must be reversed. This is not an abstraction: In response to Appellants' public statements transparently disagreeing with the ATF, the Government drove Appellants' manufacturer into bankruptcy after raiding its facility, destroyed Appellants' multimillion dollar business, and seized Appellants' property—on nothing more than the ATF's unilateral unreviewed opinion and without having to prove their case in court.

## A. The Government must prove Appellants "knew" their oft-stated beliefs were false.

To establish mail and wire fraud, the government must prove that the defendants had a fraudulent intent, that is, the defendants knew their alleged misrepresentations were false. *United States v. Gutman*, 711 F. App'x 20, 23 (2d Cir. 2017); *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). What is required is far more than a mere mistaken opinion. The nature of the scienter involves "deceit" and "defendants [who] contemplated doing actual harm[.]" *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991).

46

## B. Appellants publicly broadcasted their interpretation of the law.

It is undisputed that Appellants were in the business of selling a device that enabled users to fire an AR-15 at a high rate of fire. There is no evidence that the product Appellants sold failed to operate as promoted. A178. In the context of the inescapable question of the FRT-15's legality, Appellants chose to pro-actively and transparently publish their view. In videos, in emails, and in solicitations, Appellants openly professed their belief that the FRT-15 was not a machinegun, in reliance on both lawyers and firearms experts. On this belief, they invested heavily in developing their company, from buying a patent to contracting with a manufacturer.

## C. The court erroneously equated Appellants' knowledge of the ATF's differing opinion with knowledge Appellant's statements were false.

The court initially framed the issue correctly: "It is undisputed that [Appellants] repeatedly told their customers that the FRT-15 was legal. . . . *The question is whether [Appellants] knew that these representations were false.*" A178 (emphasis added). And the court's final conclusion tracked this framing, finding that "[Appellants] . . .

47

knew that the FRT-15 was almost certainly an illegal product, yet they told their customers the opposite." A199.

But having begun and concluded its analysis around a standard based on Appellants' *knowledge of the **falsity** of their own representations*, the court's reasoning in between was instead founded on Appellant's mere knowledge that the ATF disagreed, or ***would likely disagree in the future***, with Appellants' assessment of the legality of the FRT-15. A179, A185-A187, A189-A191.

The court's analysis began with the fact that the ATF opined that a different device called the AR-1 was a machinegun. The court characterized the AR-1 as a "predecessor device" to the FRT-15, A179, though it was developed entirely independently from the FRT-15, as an outgrowth of a separate gun design, and required the owner to specially machine the bolt carrier to install and operate the device, whereas the FRT-15 is just a trigger assembly. A366-A367, Tr. 112:11-113:4; A376, Tr. 536:5-23; A377-A378, Tr. 545:11-546:2; A379-A380, Tr. 563:13-564:9. The court concluded that Appellants knew of the ATF's opinion of this device and knew that the ATF would "all but certainly" reach the same conclusion as to the FRT-15 due to their similarity. A179.

48

The court then made a leap in logic from Appellants' knowledge of the ATF's views of the AR-1, for that reason alone, to having a fraudulent intent when expressing a different view of the law's application to their own device: "[Appellants'] awareness of the ATF's recent classification of the AR-1 as a machinegun supports a finding that they made representations to their customers about the legality of the FRT-15 with fraudulent intent." A182. Furthermore, as the Government conceded and the court acknowledged, the ATF's cease-and-desist letter based on classification of the FRT-15 was non-binding on Appellants. A383-384, Tr. 65:25-66:7. Thus, a similar classification letter to a different party on a different trigger would certainly have been non-binding Appellants as well.[7]

---

[7] *See Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 86 Fed. Reg. 30826, 30827 (June 10, 2021) ("Even though firearms may have a similar appearance … an ATF classification of a firearm pertains only to the particular sample submitted because of the vast variations in submissions, the application of different relevant statutes and judicial interpretations of these statutes, the manufacturer's or maker's stated intent, and the objective design features supporting or undercutting that stated intent that may be legally and technically significant."); *see also Porter & Dietsch, Inc. v. F.T.C.*, 605 F.2d 294, 307 n.17 (7th Cir. 1979) ("Agency adjudications do not create industry-wide standards as rulemaking does.").

### D. The court's analysis of good faith precludes cissent from Government opinion.

The court dismissed Appellants' argument that they believed in good faith their interpretation of the law as applied to their device was correct and that the ATF's opinion was wrong or would be wrong when made in the future. A179, A182-A183, A189-190. The court simply deferred entirely to the ATF's opinion, the implication of which is that one cannot disagree with a known opinion of the ATF without being a fraud.

In pertinent part, the court expressly equated a gun's legality with the ATF's opinion of its legality when the court concluded that Appellants' knowledge of a similarity between the AR1 and the FRT-15, by itself, "strongly supports the inference that Appellants knew at the moment they launched RBT that there was a significant likelihood that the FRT-15 was also an illegal device and would be classified as such[.]" A183-A184. After discussing the origin of the FRT-15 design, the court again expressly equated the FRT-15's legality with the unilateral and unadjudicated opinion of the ATF about the AR1:

> the Court finds that Defendants' knowledge of the AR-1—
> including not only the ATF's designation of that device as a
> machinegun but the reasons for that designation, and that the

50

> key feature leading to that classification remained
> functionally unchanged in the FRT-15—supports a finding
> that Defendants lied to their customers when they told them
> that the FRT-15 was "absolutely, positively" a legal trigger.

A185. There is no room in this interpretation of the law for one to

disagree with the ATF's opinion and avoid having a fraudulent intent.

The court's opinion superficially purports to engage in an analysis

of whether Appellants believed in good faith that their statements were

true, which is a defense to a fraud allegation.  As to Appellants' reliance

on the advice of *four* experts for their belief and representations that

the FRT-15 was legal, here too the court's total deference to the ATF

and equation of the ATF's opinion with the law overwhelms (and fatally

dooms) the analysis. The court thus rejected Appellants' good faith

reliance on one expert, Daniel O'Kelly, who opined the FRT-15 was not

a machine gun, because he predicted the ATF would have a different

opinion. A186. The court summarily dismissed the opinions of two other

experts because they had first been given O'Kelly's opinion, A187, just

as the ATF's expert witness used prior reports on FRTs prepared by

others. A368, Tr. 168:6-22; A369, Tr. 173:5-14; A370-A371, Tr. 176:12-

16, 177:1-21.

Adding insult to injury, despite the court and the parties having taken live testimony from two of Appellants' experts and declarations from two of their other experts, the court speculated out of whole cloth that "it appears much more likely to the Court that Appellants, at least once they had O'Kelly's report in hand, presented their experts with a question to which they signaled a commercially 'correct' answer and at least one analytical route to that end." A187.

Similarly, the court's extensive discrediting of Appellants' fourth expert primarily turned on his knowledge of what the ATF's likely opinion of the FRT-15 would be. A189-A190 (stating that, regardless of Vasquez's testimony that he disagreed with the ATF's classifications, his "history with the ATF put him on notice that the ATF would likely consider the FRT-15 to be an illegal device. . . . In short, it is difficult to conceive that Vasquez did not disclose this information to Defendants and warn them about the likelihood that the ATF would reach the same conclusion on the FRT-15[.]").

The court's bias, deferring entirely to the ATF and its opinion as the final word on the legality of a device, even led the court to disparage Mr. O'Kelly's impeccable firearms expertise (though the court indeed

qualified him) on the spurious ground that his exhaustive qualifications simply did not include formally classifying machineguns for the ATF. A194 ("At the ATF, [the Government's expert] is specifically charged with (among other things) classification of firearms and making official determinations as to whether such devices are machineguns under §5485(b). . . . O'Kelly . . . has no such experience.").

The court's undue and total deference to the ATF is exemplified by these efforts to find reasons to disregard all four of Appellants' experts and their multiple decades of individual experience with the ATF— including Luettke's service as the head of the ATF's Firearms and Ammunition Technology Division's training branch, ECF No. 140, Tr. 377:18-24, 381:15, and O'Kelly's creation of the ATF's firearms technology training materials for machinegun determinations, ECF No. 142, Tr. 259:23-261:13—in favor of Ciravolo, whose expertise stems from two years of gunsmith school and a certificate, ECF No. 142, Tr. 25:15-21.

Accordingly, not only did the court equate the ATF's opinion or expected opinion with a conclusive legal determination, it indicated that nobody other than an ATF firearms examination officer is competent to

determine whether a device is a machine gun. We are talking about the line between the lawful exercise of one's Second Amendment right to bear arms and being a serious felon and, in Appellants' case, the difference between operating a successful business and a fraudulent enterprise that one government agency can and did destroy *without* a criminal charge and *before* they filed a complaint in the court below.

The court's treating as synonymous the legality of a gun with the ATF's opinion of that gun, as explained here through the above examples, refutes the Court's statement on page 75 of its opinion that "Not only did Defendants have independent reason to know that their experts' opinions about the legality of the FRT-15 were likely incorrect, but at least one (and likely more than one) of these experts warned Defendants of this possibility himself." A186. This sentence is not supported with any citation to the record. None of Appellants' experts informed Appellants that the opinion they provided was incorrect. This sentence in the opinion compels a reading, consistent with the points discussed throughout this section, that the Court deems opinions to be "incorrect" if they conflict with the ATF's opinion. This text in the court's opinion masks the court's total deference to the ATF's

classifications, and the court's expectation that citizens also defer to the ATF's classifications, or anticipated classifications, or else risk being deemed to have a fraudulent intent.

### E. The ATF's changing policies and losses in court preclude deference to its opinions as infallible.

The district court's expectation of unquestioning submission to the ATF's opinion is insupportable given the ATF's own vacillating opinions and stunning losses before courts that have reversed its interpretations. For example, the ATF classified devices called bump stocks as non-machineguns until the day that it changed its mind and deemed them to be machineguns, which only lasted until a court held that the ATF was wrong. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023).

*     *     *     *

The court thus erred as a matter of law by equating Appellants' supposed knowledge of the legality of a device with knowledge of the ATF's current or expected *opinion* of the legality of a device. Because the ATF can be wrong, as it has repeatedly been before, and it can change its mind, as it has done before, Appellants' knowledge of the ATF's opinion, or anticipation of an ATF opinion, is not knowledge that their own stated contrary opinion was false.

55

Accordingly, as a matter of law, the court erred by concluding the Government was likely to prove that Appellants had the requisite fraudulent intent when they opined to customers that the FRT-15 was legal.[8]

## IV. The Government's theory of fraud effectively amounts to a reapplication of the "right-to-control" theory that was rejected by the United States Supreme Court in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023).

The Government's theory of fraud effectively amounts to a reapplication of the "right-to-control" theory that was rejected by the United States Supreme Court in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023).

In *Ciminelli*, the Court rejected this circuit's longstanding "right-to-control" theory of fraud. "Under the right-to-control theory, a defendant is guilty of wire fraud if he schemes to deprive the victim of 'potentially valuable economic information' 'necessary to make

---

[8] The Court noted that if it had not found that "the Defendants *knew* that they were defrauding their customers," it would have found their statements were reckless, and therefore fraudulent as well. A177 n.33. Because the court's finding of recklessness would similarly be founded on equating dissent from the ATF's opinion, or anticipated opinion, with a culpable state of mind, the analysis is erroneous as a matter of law for the same reasons described above.

discretionary economic decisions.'" *Ciminelli*, 598 U.S. at 309 (quoting *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021)). Thus, a defendant could be found guilty of wire fraud if the victim was "deprived of potentially valuable information that it would consider valuable in deciding how to use its assets," where "economically valuable information" was defined as "information that affects the victim's assessment of the benefits or burdens of a transaction, or relates to the quality of goods or services received or the economic risks of the transaction." *Id.* at 311 (citations omitted).

To reach this decision, the Supreme Court had three principal considerations. First, the "right to control" theory is not supported by the federal fraud statutes. "The so-called 'right to control' is not an interest that had 'long been recognized as property' when the wire fraud statute was enacted." *Ciminelli*, 598 U.S. at 314 (citing *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).

Second, the "right to control" theory is "inconsistent with the structure and history of the federal fraud statute." *Id.* at 315. When Congress enacted 18 U.S.C. § 1346 to include within the federal fraud statutes the "intangible right of honest services," Congress refrained

from including other intangible rights that courts had been reading into the statute. *Id.* ("'Congress' reverberating silence about other [such] intangible interests' forecloses the expansion of the wire fraud statute to cover the intangible right to control." (quoting *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014))).

Third, the "right to control" theory "vastly expands federal jurisdiction without statutory authorization." *Id.* This is because the theory "treats mere information as the protected interest." *Id.* Thus, "almost any deceptive act could be criminal." *Id.* Policing such acts has been "traditionally left to state contract and tort law." *Id.* So the theory is "in flat contradiction with our caution that, '[a]bsent [a] clear statement by Congress,' courts should 'not read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States.'" *Id.* at 315-16 (alterations in original) (quoting *Cleveland*, 531 U.S. at 27)).

Customers who ordered forced reset triggers from Appellants received forced reset triggers that operated as they expected. As the district court noted during the preliminary injunction hearing, "nobody disputes that the product did what was advertised; meaning, you could

58

install it with minimal skill into a traditional semiautomatic weapon and it would shoot a lot faster if the shooter chose to exercise that option." A243, Tr. 87:11-15. Appellants' customers got exactly what they asked for and were promised. Furthermore, every customer checked a box as part of the check-out process that they would comply with federal and state law. A329, Tr. 446:18-23.

In order to transform this straightforward transaction into a civil offense, the Government claims that Appellants' clients were "defrauded" out of their money based on Appellants' alleged failure to tell their customers purported "key facts," specifically that the ATF determined that another device, the AR-1, is a machinegun, that the FRT-15 purportedly functions similarly to the AR-1, and that Appellants did not seek an ATF classification for the FRT-15 (as it is undisputed that they had no legal obligation to do). A29 ¶ 13(g); A42-A43, 91-93.[9] The district court effectively accepted the Government's arguments.

The crux of the Government's argument is that Appellants' customers would have found it economically valuable to have more

---

[9] See also ECF No. 5 at 29.

information about the process behind the creation of the FRT-15 and the ATF's view on its legal status, or the legal status of an allegedly similar device, before making their purchases. The Government believes Appellants should have provided more information about the benefits or burdens of the transaction and economic risks involved, specifically, the risk of losing property to ATF seizures if the ATF sought to enforce a disputed interpretation of the definition of "machinegun." This is the right-to-control theory by another name.

Accordingly, the district court's determination that the Government was likely to succeed on the merits of their mail and wire fraud claims should be reversed.

## V. A "*Klein* conspiracy" no longer remains a valid theory in light of *Ciminelli* and other intervening case law.

The Government's broad theory of a *Klein* conspiracy is irreconcilable with a growing list of cases, including most recently *Ciminelli v. United States*, that "have held . . . that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." 598 U.S. 306, 309 (2023). Because the district court did not find that Appellants conspired to deprive the United States of a

traditional property interest, it erred as a matter of law in finding that the Government was likely to succeed on their 18 U.S.C. § 371 claim.

Section 371 provides, in pertinent part, "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." The Fraud Injunction Act further permits the government to bring a civil action to enjoin *ongoing* violations of section 371. 18 U.S.C. § 1345(a)(1)(A).

The Government alleges in Count I that Appellants have violated section 371 because they "knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the ATF in their regulation of machineguns under the NFA and the GCA." A57 ¶ 196. Tellingly, this accusation focuses on impeding, impairing, obstructing, and defeating the lawful functions of government—concepts that appear nowhere in the statute, but are typically referred to as a "*Klein*

conspiracy." *See generally United States v. Klein,* 247 F.2d 908 (2d Cir. 1957).

The district court granted a preliminary injunction in part on this basis, finding the Government was likely to succeed in its claims that Appellants violated section 371. *See United State v. Rare Breed Triggers, LLC, et al*, 2023 WL 5689770 at *38 (E.D.N.Y. Sept. 5, 2023). The district court focused only on a conspiracy "to prevent the ATF from carrying out its lawful functions." *Id* at *40. It did not look to any financial harm to the United States.

In doing so, the district court applied an expanded definition of the term "defraud" that is irreconcilable with consistent Supreme Court precedent and ventured beyond the province of the judiciary to effectively create a common law crime.

## A. "Defraud" requires the deprivation of a traditional property interest.

For over four decades, the Supreme Court has advised that the term "defraud" means to deprive the victim of a traditional property interest and rejected exotic and expansive definitions. This view was reaffirmed (again) this past term in *Ciminelli*, which rejected the "longstanding 'right-to-control' theory of fraud" adopted by this circuit,

*see Ciminelli*, 598 U.S. at 308, and reiterated that the Court "ha[s] consistently rejected such federal fraud theories that 'stray from traditional concepts of property." *Id.* at 314-315 (quoting *Cleveland v. United States*, 531 U.S. 12, 24 (2000)).

Concept creep in federal fraud statutes is nothing new. "Lower federal courts for decades interpreted the mail and wire fraud statutes to protect intangible interests unconnected to traditional property rights." *Ciminelli*, 598 U.S. at 312. In 1987, the Court "halted that trend by confining the federal fraud statutes to their original station, the 'protect[ion of] individual property rights.'" *Id* at 313 (quoting *McNally v. United States*, 483 U.S. 350, 359 n. 8 (1987)). In 2000, the Court "again stated that [the mail fraud statute] protects property rights only" and reiterated "'[the] common understanding' that 'the words 'to defraud' commonly refer to 'wronging one in his property rights.'" *Cleveland v. United States*, 531 U.S. 12, 19 (2000) (quoting *McNally*, 483 U.S. at 358-59)).

Building upon these cases and subsequent Congressional action to specifically encompass honest services, ten years later in *Skilling v. United States* the Court adopted a limiting construction of the federal

63

honest services statute, limiting it to "*only* the bribe-and-kickback core of the pre-*McNally* case law." 561 U.S. 358, 409 (2010). For the Court, this construction was necessary to avoid "constitutional limitations," particularly concerns about vagueness and due process. *Id*.

This Court considered the continuing viability of the *Klein* conspiracy doctrine following *Skilling*. *See United States v. Coplan*, 703 F.3d 46 (2012). *Coplan* was highly critical of *Klein*, recognizing that the *Klein* conspiracy doctrine has no basis in the text of the statute. To wit, *Coplan* noted:

> There is nothing in the Government's brief recognizable as statutory interpretation—no discussion of plain meaning, legislative history, or interpretive canons. . . . The Government thus appears to implicitly concede that the *Klein* conspiracy is a common law crime, created by courts rather than by Congress. That fact alone warrants considerable judicial skepticism.

*Coplan*, 703 F.3d at 61.

Instead, *Coplan* observed that the underlying basis of *Klein* "appears to rest on a policy judgment—that in the nature of things, government interests justify broader protection than the interests of private parties—rather than on any principle of statutory interpretation." *Coplan*, 703 F.3d at 61.

64

Nevertheless, despite eviscerating the foundation of the *Klein* conspiracy, this Court pulled its punches, relying on *stare decisis* concerns and the "scope of the law of the Circuit" to uphold the continuing viability of *Klein*. *Coplan*, 703 F.3d at 62.

Intervening events only serve to highlight the unviability of the *Klein* conspiracy. For example, the Court has continued to reject broad and novel theories of "fraud." *See generally Percoco v. United States*, 598 U.S. 319 (2023) (rejecting a theory of honest services fraud where a private individual had a "special relationship" with the government and "dominated and controlled" government business, abrogating *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982)); *Kelly v. United States*, 140 S.Ct. 1565 (2020) (rejecting claim that the wrongful rerouting of traffic on the George Washington Bridge constituted a property fraud); *McDonnell v. United States*, 579 U.S. 550 (2016) (rejecting theory that setting up a meeting, talking to another official, or organizing an event, without more, constituted an "official act"). And, most recently in *Ciminelli*, the Court once again rejected a broad theory of fraud, notwithstanding its "longstanding" application in this circuit.

65

**B.** ***Ciminelli* is irreconcilable with the doctrine of *Klein* conspiracy.**

*Ciminelli* should be the final nail in *Klein*'s coffin. First, *Ciminelli* yet again confirms that the common law meaning of "fraud" is "wronging one in his property rights." *Ciminelli*, 598 U.S. at 312 (quoting *Cleveland*, 531 U.S. at 19). The Court has counseled that courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" *Jam v. International Finance Corporation*, 139 S.Ct. 759, 769-770 (2019) (quoting *Neder v. United States*, 527 U.S. 1, 23 (1999)). Likewise, this Court has observed that it is "one of our most foundational principles of statutory construction" that "where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Jean v. Sessions*, 899 F.3d 182, 187-188 (2d Cir. 2018) (quoting *Neder*, 527 U.S. at 21). Indeed,

> [t]his "settled principle of interpretation" assumes that when "Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from

66

which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."

*Jean*, 899 F.3d at 188 (quoting *Sekhar v. United States*, 570 U.S. 729, 732-33 (2013)).  In drafting section 371, Congress borrowed the common law concept of "fraud." The well-settled common law meaning of fraud requires a nexus to traditional property rights that is irreconcilable with vague and amorphous concepts like "impeding" or "impairing" functions of government.

It is also a basic principle of statutory interpretation that "identical words used in different parts of the same act are intended to have the same meaning." Bryan A. Garner & Antonin Scalia, READING LAW 170 (West 2012) (quoting *Atlantic Cleaners & Dryers, Inc. v. United States.*, 286 U.S. 427, 433 (1932)).[10] It defies common sense and the

---

[10] The federal mail fraud statute was "first enacted" in 1872. *McNally v. United States*, 483 U.S. 350, 356 (1987). *Ciminelli* noted that the Court has read the mail fraud statute and the wire fraud statute *in pari materia*. *Ciminelli*, 143 S.Ct. at 1126 n.2 (citing *Pasquantino v. United States*, 544 U.S. 349, 355 n. 2 (2005)). Section 371 was first enacted in 1867, roughly contemporaneously with the mail fraud statute. *See* Act of March 2, 1867, ch. 169, 30, 14 Stat. 484; *see also* Petition for Writ of Certiorari, *Coplan v. United States*, Case No. 12-1299, 2013 WL 1819823 at *10 (U.S. Apr. 26, 2013); Abraham S. Goldstein, *Conspiracy to Defraud the Government*, Yale L. J. 405, 418 (1959) (describing the history of the conspiracy statute).

presumption of consistent use canon of statutory interpretation to continue to hold that "fraud" means one thing everywhere else in the federal code, yet magically assumes a broader, heretofore unknown definition in section 371.[11]

Second, *Ciminelli* confirms that just because this circuit has applied a doctrine for a long time does not mean it has done so correctly or should keep doing so. *Ciminelli* acknowledged that the "right-to-control" theory of fraud was "longstanding" in the Second Circuit. *Ciminelli*, 598 U.S. at 308. The Court unanimously rejected it anyway. This undercuts the *stare decisis* argument that was the sole basis for *Coplan*'s continued application of the *Klein* conspiracy doctrine.

In *Coplan*, this Court recognized that a "*Klein* conspiracy" is effectively a judicially created common law crime. *See Coplan*, 703 F.3d at 61. But "the notion of a common-law crime is utterly anathema today

---

[11] The government traditionally relies on language in *Hammerschmidt v. United States* that "fraud" against the federal government "also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest" to justify the notion of a *Klein* conspiracy. 265 U.S. 182, 188 (1924). However, this language is dicta; the Court in *Hammerschmidt* actually overturned defendants' convictions. *Id.* at 189 ("We think the demurrer to the indictment in this case should have been sustained and the indictment quashed.").

. . . ." *Rogers v. Tennessee*, 532 U.S. 451, 476 (2001) (Scalia, J., dissenting); *see also United States v. Gradwell*, 243 U.S. 476, 485 (1917) ("[T]here are no common-law offenses against the United States."). This Court has recognized that "[t]he redrafting of federal statutes . . . is not the proper province of the judiciary, and '[f]ederal crimes are defined by Congress, not the courts.'" *United States v. Zichetello*, 208 F.3d 72, 86 (2d Cir. 2000) (quoting *United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997)). Thus, there is no valid basis for the continued application of the extra-statutory *Klein* conspiracy doctrine.

The notion of a "*Klein* conspiracy" was judicial overreach when it was first adopted. It has been consistently undermined by repeated Supreme Court decisions that reaffirm that unless Congress specifically says something else, "fraud" requires a deprivation of a traditional property right. This was true when *Coplan* relied on *stare decisis* to salvage it and it is all the more true today, in the wake of *Ciminelli*, which reiterated that "fraud" means a deprivation of a traditional property interest and indicated that even "longstanding" judicial constructions that depart from this basic definition must be jettisoned.

69

The district court relied on an inappropriately broad theory of fraud that contained no reference to traditional property rights in determining that the Government was likely to succeed on the merits. Because this theory is wrong, the district court's preliminary injunction order must be reversed.

## CONCLUSION

For the foregoing reasons, the district court's decision should be reversed.

Respectfully submitted,

*/s/ Josiah Contarino*
JOSIAH CONTARINO

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
50 Park Place, Suite 1105
Newark, NJ 07102
917-423-7221
jcontarino@dhillonlaw.com

GARY M. LAWKOWSKI
DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
703-574-1654
glawkowski@dhillonlaw.com

January 16, 2024                    *Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2024, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Josiah Contarino*
Josiah Contarino

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. R. 32(f), this brief contains 13685 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Josiah Contarino*
Josiah Contarino
*Counsel for Appellants*

Dated: January 16, 2024