# 23-7276

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

—v.—

RARE BREED TRIGGERS, LLC,
RARE BREED FIREARMS, LLC,
LAWRENCE DEMONICO, KEVIN MAXWELL,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR THE PLAINTIFF-APPELLEE

BREON PEACE
*United States Attorney*
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-6228

VARUNI NELSON
RACHEL G. BALABAN
MICHAEL S. BLUME
DAVID A. COOPER
*Assistant United States Attorneys,*
     *Of Counsel.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iv

PRELIMINARY STATEMENT ............................................................1

ISSUES PRESENTED FOR REVIEW ..................................................2

STATEMENT OF THE CASE..............................................................3

    A.    Relevant Facts ........................................................................3

        1.    Defendants Set Up Companies to Sell the FRT-15 ...................3

        2.    The Operation of the FRT-15 ..................................................4

        3.    History and Development of the FRT-15 ..................................5

            a.    J. Cooper Rounds Developed the FRT-15 and Discussed the Product With Defendants, Who Saw in It a Big Money-Making Opportunity ..................5

            b.    The Initial Design of the FRT-15 Was Deemed Illegal by ATF....................................................................5

            c.    Defendants Purchased the Rights to the FRT-15, Knowing That Its Predecessor Was Deemed Illegal and Having Been Warned That the Product Was Problematic ................................................6

        4.    Defendants Did Not Want to Miss Out on Big Money From FRT-15 Sales; So, They Did Not Seek an ATF Classification............................................................................7

        5.    Defendants Intended to Lead Their Customers Into Believing That ATF Determined the FRT-15 Was Legal.......................................................................................9

        6.    Defendants Knew All Along That ATF Would Seek to Stop the Sale of FRT-15s.......................................................11

        7.    From the Beginning, Defendants Took Steps to Interfere With ATF's Law Enforcement Efforts by "Shredding" Customer Data .....................................................12

8. Defendants Refused to Cease Their Sale of the FRT-15s After ATF Formally Declared the Product to Be Illegal ........................................................................ 13

9. DeMonico Interfered With an ATF Investigation by Seizing FRT-15s and FRT-15 Parts From a Manufacturing Company That Was Preparing to Turn the Items Over to Law Enforcement .......................................... 14

10. Defendants Took Steps to Hide Their Sale of FRT-15s From the Government .................................................. 16

B. Proceedings in the District Court ....................................... 17

1. The Filing of the Complaint ...................................... 17

2. The Grant of the TRO and Scheduling of a Preliminary Injunction Hearing .................................. 17

3. Defendants' Misrepresentation to the District Court in Connection With the Motion to Dismiss for Lack of Personal Jurisdiction .............................................. 18

4. The Denial of the Transfer Motion ........................... 20

5. The Preliminary Injunction Hearing ......................... 21

C. The District Court's Decision ............................................. 21

SUMMARY OF THE ARGUMENT .................................................... 26

ARGUMENT ...................................................................................... 27

THE DISTRICT COURT'S GRANT OF A PRELIMINARY INJUNCTION SHOULD BE AFFIRMED ................................... 27

A. Standard of Review ............................................................. 27

B. The District Court Did Not Abuse Its Discretion in Finding That Defendants Committed Ongoing Mail and Wire Fraud ....................................................................... 30

1. The Elements of Mail and Wire Fraud ......................................30

2. Defendants Mischaracterize the District Court's Analysis of the Fraud Claims in This Case..............................31

3. The District Court Did Not Abuse Its Discretion in Finding That Defendants Intentionally Withheld Key Facts From Their Customers.......................................................32

4. The District Court Did Not Abuse Its Discretion in Finding That Defendants' Purported Reliance on Experts Was Not in Good Faith..................................................36

5. Defendants' Claim of Good Faith With Respect to Their Customers is Contradicted by Their Lack of Good Faith in Their Submissions to the District Court Itself.........................................................................................38

C. The District Court Did Not Abuse Its Discretion in Finding That Defendants Engaged in a *Klein* Conspiracy.................39

    1. The Elements of a *Klein* Conspiracy .........................................39

    2. Defendants' *Klein* Conspiracy ..................................................40

    3. Section 371 Forms a Valid Basis for a Preliminary Injunction Under the Anti-Fraud Injunction Act.....................41

    4. Defendants Used Dishonest Means to Interfere With ATF Functions .........................................................................43

    5. DeMonico's Repossession of FRT-15s From the 3rd Gen Facility Was an Overt Act in Furtherance of Defendants' Conspiracy.............................................................48

D. *Ciminelli* Has No Bearing on this Case...............................................50

    1. Nothing About *Ciminelli* Undermines the Mail and Wire Fraud Counts.....................................................................50

    2. *Ciminelli* Does Not Apply to Section 371 ................................52

# TABLE OF AUTHORITIES

## Cases

*Ceraso v. Motiva Enterprises, LLC*, 326 F.3d 303 (2d Cir. 2003) ............ 45, 51, 53

*Ciminelli v. United States*, 598 U.S. 306 (2023) ........................................ 23, 24, 53

*Citigroup Global Mkts., Inc. v. VCG-Special Opportunities Master Fund Ltd.*, 589 F. 3d 30 (2d Cir. 2010) ................................................... 27, 28

*Dennis v. United States*, 384 U.S. 855 (1966) ........................................................42

*Haas v. Henkel*, 216 U.S. 462 (1910) ....................................................................42

*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ........................................43

*Lorillard v. Pons*, 434 U.S. 575 (1978) ................................................................43

*Luis v. United States*, 578 U.S. 5 (2016) ........................................................... 28, 29

*McNally v. United States*, 483 U.S. 350 (1987) ....................................................53

*New York v. DHS*, 969 F.3d 42 (2d Cir. 2020) ......................................................43

*Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38 (2d Cir. 2000) ..............................29

*Principal Nat'l Life Ins. Co. v. Coassin*, 884 F.3d 130 (2d Cir. 2018) .................45

*United States v. Arterbridge*, 374 F.2d 506 (2d Cir. 1967) ...................................38

*United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020) .................................. 39, 41, 52

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .............................. 30, 31, 35

*United States v. Ballistrea*, 101 F.3d 827 (2d Cir. 1996) ............................... 39, 46

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ........................ 31, 35, 37, 38

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ................................ 41, 42, 47

*United States v. Furkin*, 119 F.3d 1276 (7th Cir. 1997) ........................................49

*United States v. Klein*, 247 F.2d 908 (2d Cir. 1957) ..............................................39

*United States v. Mendez*, 315 F.3d 132 (2d Cir. 2002) ..........................................49

*United States v. Meneilly*, 78 F. Supp. 2d 95 (E.D.N.Y. 1999) ..............................49

*United States v. Nersesian*, 824 F.2d 1294 (2d Cir. 1987) ....................................41

iv

*United States v. Petrossi*, 786 F. App'x 286 (2d Cir. 2019)...................................31

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ...........................................50

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ................................................45

*United States v. Southland Corp.*, 760 F.2d 1366 (2d Cir. 1985)...........................49

*United States v. William Savran & Assocs.*, 755 F. Supp. 1165 (E.D.N.Y. 1991)...........................................................................................................28

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016)............................................................................ 31, 32, 35

## Statutes

18 U.S.C. § 371 .................................................................................... *passim*

18 U.S.C. § 1341 .................................................................................. *passim*

18 U.S.C. § 1343 ....................................................................... 1, 2, 51, 53

18 U.S.C. § 1345 .................................................................................. *passim*

18 U.S.C. § 1349 ...................................................................... 17, 22, 28

18 U.S.C. § 1341 .................................................................................. *passim*

26 U.S.C. § 5845(b) ............................................................... 10, 12, 13 22

## Regulations

28 C.F.R. § 0.130(a)(1)..............................................................................40

28 C.F.R. § 0.130(a)(2)..............................................................................40

28 C.F.R. § 0.130(b)(2)..............................................................................50

## Rule

Fed. R. App. P. 30(b)(1)..............................................................................1

# PRELIMINARY STATEMENT

This brief is submitted by Plaintiff-Appellee United States of America ("United States" or "Government"). Defendants-Appellants Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, Lawrence DeMonico, and Kevin Maxwell ("Defendants") appeal from a memorandum and order of the United States District Court for the Eastern District of New York (Morrison, J.), dated September 5, 2023, (the "decision"), which granted preliminary injunctive relief to the United States. *See* Appendix filed by Defendants ("A") 23 (##139, 141), 24, 112–240;[1] *United States v. Rare Breed Triggers, LLC*, *et al.*, --- F. Supp. 3d --- (E.D.N.Y. 2023).

In this action brought under the Anti-Fraud Injunction Act, 18 U.S.C. § 1345, the United States alleges that Defendants were violating or about to violate several criminal statutes, including the mail and wire fraud statutes, 18 U.S.C. § § 1341, 1343, and the general conspiracy statute, 18 U.S.C. § 371. The United States alleges that, in selling a trigger designed for an AR-15–style rifle – which they call the FRT-15 – Defendants (1) sold an illegal machinegun component; (2) misled their customers into believing that the product was legal; and (3) interfered with the Government's ability to track and regulate the sale of illegal firearms.

---

[1] The Government is filing a Supplemental Appendix ("SA"), *see* Second Circuit Local Rule 30.1(g), that includes record evidence for this Court's consideration that Defendants did not include in their Appendix. Defendants did not consult with the Government on filing a joint appendix. *Cf.* Fed. R. App. P. 30(b)(1).

In granting the preliminary injunction against Defendants, the district court found that the FRT-15 was illegal. It also found that Defendants hid from their customers material facts about the illegality of the FRT-15. And it found that Defendants took steps to impede the Government in its effort to stop the illegal sale of machinegun components.

On appeal, Defendants have not challenged the illegality of the FRT-15, and instead focus their attention on the district court's grant of a preliminary injunction under the Anti-Fraud Injunction Act. As shown below, Defendants cannot establish that the district court abused its discretion in granting preliminary injunctive relief to the United States. Defendants also cannot establish that the district court's factual findings were clearly erroneous, or that the district court misapplied any law.

Accordingly, the district court's grant of a preliminary injunction should be affirmed.

## ISSUES PRESENTED FOR REVIEW

Whether the district court abused its discretion in granting a preliminary injunction pursuant to 18 U.S.C. § 1345 by finding that the United States is likely to succeed on the merits of its claims that Defendants committed mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

Whether the district court abused its discretion in granting a preliminary injunction under 18 U.S.C. § 1345 by finding that the United States was likely to

succeed on the merits of its claim that Defendants were engaged in a conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

## STATEMENT OF THE CASE

### A.  Relevant Facts

#### 1.  Defendants Set Up Companies to Sell the FRT-15

Rare Breed Triggers ("RBT") is a limited liability company that was created by four individuals to sell the FRT-15. SA33–34 (#140, at 420:3–25).[2] Those individuals are Lawrence DeMonico ("DeMonico") and Kevin Maxwell ("Maxwell"), both of whom are Defendants here, along with Cole Leleux ("Leleux") and Michael Register ("Register"). A315:3–25. During the relevant time period, DeMonico was the president of RBT. SA119:11–16. As the president, DeMonico "ran the company, [made] the large majority of decisions for [RBT] when it comes to business, marketing, day-to-day operations . . . [including any] photographs . . . [and] advertisement" used to promote the sale of the FRT-15. SA120:6–16.

Over the course of two years beginning in December 2020 – when Defendants began selling the FRT-15 – Defendants earned at least $39 million in proceeds from

---

[2]    Defendants' Appendix contains select pages from the transcript ("Tr.") of the preliminary injunction hearing. If hearing testimony referred to herein is included in the Defendants' Appendix, the Government cites the page of the Appendix. For transcript pages not included in Defendants' Appendix, the Government cites directly the transcript of the preliminary injunction hearing filed on the Civil Docket for Case #: 1:23-cv-00369-NRM-RML (E.D.N.Y.) ("Dist. Ct. Dkt."; *see* SA1-34) at ## 140, 142.

the sale of machinegun conversion devices. SA570–79; *see also* A133, 137 (citing testimony and exhibits from the preliminary injunction hearing).

### 2. The Operation of the FRT-15

The FRT-15 is a drop-in trigger that is designed to replace the standard trigger assembly in an AR-15–style rifle. SA34 (#142, at 112:25–113:2); SA268:21–24. The parties do not disagree, in any material way, as to how the FRT-15 operates mechanically. And because Defendants are not here challenging the district court's finding that the United States is likely to succeed on the merits of its contention that the FRT-15 is an illegal machinegun conversion device, A147–73, an extended discussion of the operation of the FRT-15 is unnecessary.

Worth noting is what happens when a shooter operates an AR-15–style rifle fitted with an FRT-15. If a shooter pulls the trigger towards the rear and simply maintains that constant rearward pressure on the trigger, a rifle fitted with an FRT-15 will continue to fire rounds automatically. SA34 (#142, at 151:16–152:3). The FRT-15 thus converts an AR-15–style rifle into a machinegun.

The FRT-15's ease of use means that any novice shooter can pick up a rifle fitted with an FRT-15 and fire repeatedly and very quickly with little to no skill, thus achieving a machinegun rate of fire. A306:22–A307:22; SA33–34 (#140, at 345:15–19). Such a shooter can fire multiple rounds of ammunition in a fraction of a second. SA33–34 (#140, at 345:15–19).

### 3.    History and Development of the FRT-15

#### a.    J. Cooper Rounds Developed the FRT-15 and Discussed the Product With Defendants, Who Saw in It a Big Money-Making Opportunity

J. Cooper Rounds ("Rounds") is an inventor. SA33–34 (#140, at 428:16–18; 538:22–539:3). Among the items Rounds worked on was a trigger for an AR-15–style firearm. SA33–34 (#140, at 488:20–22). Over the course of a few years, Rounds told both DeMonico and Leleux about his work. SA33–34 (#140, at 428:21–429:3; 488:20–22; 562:6–21). Leleux thought that such a design was a good idea. SA33–34 (#140, at 562:22–23). The first iteration of this trigger project – called the AR-1 – was a trigger assembly that required a user to modify a standard AR-15 platform. A379:12–A380:4. Rounds, sometime later, told DeMonico and Leleux that he had made some changes to his original trigger design. A380:18–20. Now a drop-in design, the design did not require a user to modify an AR-15 platform.

#### b.    The Initial Design of the FRT-15 Was Deemed Illegal by ATF

Rounds submitted the AR-1 to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for classification. Individuals and companies that plan to sell firearms or firearms accessories may request that ATF classify their product before they begin to sell it. SA111–12 ¶ 10. One purpose of classification is to assess whether a firearm or device is regulated under federal law; that is, to determine among other things whether the firearm or device is an illegal machinegun. *Id.* at ¶ 11.

5

In 2018, ATF determined that the AR-1 was a machinegun. SA476–501. The basis for its classification was that "a single constant rearward pull will cause the firearm to fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." SA481; SA34 (#142, at 111:6–13).

Rounds advised DeMonico and Leleux that ATF had determined the AR-1 to be a machinegun. A355:19–25; SA33–34 (#140, at 565:13–20; 566:6–11).

### c. Defendants Purchased the Rights to the FRT-15, Knowing That Its Predecessor Was Deemed Illegal and Having Been Warned That the Product Was Problematic

Rounds patented the modified trigger design for the FRT-15. The patent is U.S. Patent No. 10,514,223 ("the '223 Patent"). Rounds is listed as the inventor on the '223 Patent; Wolf Tactical – Rounds' company – is listed as the applicant. *See* SA459. The FRT-15 is the commercial embodiment of the '223 Patent. A348:16–18. And the FRT-15 is the functional equivalent of the AR-1. A123 (#142, at 104:2–115:23).

DeMonico decided to purchase the '223 Patent. SA33–34 (#140, at 567:8–16). He did so knowing that the earlier iteration of the trigger, the AR-1, had been classified as a machinegun. A355:19–25; SA33–34 (#140, at 565:13–20; 566:6–11). And he did so after Rounds also told DeMonico that he was concerned that ATF would have a problem with the '223 Patent (that is, the FRT-15). SA33–34 (#140, at 566:21–567:7). Rounds' concerns led him to want to be rid of the '223 Patent. *Id*. He did not want to

invest any more into the '223 Patent out of fear that ATF would deem it to be illegal, just like it had the AR-1. *Id*.

DeMonico had no such fear. Instead, as he put it, he had the "balls" to sell the FRT-15. SA455.

The arrangement between DeMonico and Rounds comprises a written agreement and a verbal agreement. In writing, DeMonico agreed to pay Rounds $10,000. A348:22–24; SA33–34 (#140, at 539:4–12; 567:17–22). Verbally, DeMonico promised to pay Rounds an additional $25 for each trigger sold. A348:25–A349:9; A355:4–12; SA33–34 (#140, at 567:23–568:5). Rounds was paid the $25-per-trigger royalty by check. SA33–34 (#140, at 568:4–5). But the checks were not written to Rounds or to Wolf Tactical. SA33–34 (#140, at 568:21–569:9). Rather, the checks were written to other companies: Wizard Labs and CRDB. *Id*.

### 4. Defendants Did Not Want to Miss Out on Big Money From FRT-15 Sales; So, They Did Not Seek an ATF Classification

Defendants did not participate in ATF's voluntary classification process to assess the legality of the FRT-15. SA33–34 (#140, at 590:11–19). They also knew that ATF would classify the FRT-15 as an illegal machinegun conversion device. First, as noted above, Rounds told them as much. SA33–34 (#140, at 566:21–567:7) Second, so too did a consultant they hired to examine the product. Prior to selling the FRT-15, Defendants engaged Daniel O'Kelly ("O'Kelly"), a former ATF official, to advise them about the legality of the FRT-15. Asked about what he told Defendants at that

time, O'Kelly testified that he warned Defendants that "I guarantee you, or . . . do not be surprised if ATF calls" the FRT-15 a machinegun. SA33–34 (#140, at 369:24–370:1-3), A314:1–3. O'Kelly further testified that he believed anyone marketing a machinegun would be at grave risk of swift enforcement action from ATF. SA33–34 (#140, at 331:15–332:24); SA33–34 (#140, at 368:17–369:1).

Defendants nonetheless wanted to sell the FRT-15. And they did not seek an ATF classification before doing so, even though they knew, as DeMonico put it, that seeking such a classification was the "customary" process for those about to put products like the FRT-15 on the market. SA33–34 (#140, at 504:3–6); SA548:27-SA549:4. RBT's owners feared, based on past experience, that they would miss out on a big money-making opportunity if they were to seek an ATF classification. SA33–34 (#140, at 556:6–559:18).

Leleux, as chief executive officer of a company called Spike's Tactical, had experience seeking ATF classification of products. SA33–34 (#140, at 555:23–556:8). One such experience involved a suppressor. SA33–34 (#140, at 556:9–557:8). Spike's Tactical had sought ATF classification of the product. SA33–34 (#140, at 556:23–24). In Leleux's telling, ATF advised Spike's Tactical that the suppressor would be illegal. SA33–34 (#140, at 556:24–557:5). So, Spike's Tactical did not go forward with the product. SA33–34 (#140, at 557:6–8). Later, Spike's Tactical learned that other companies had nonetheless been selling a similar product. SA33–34 (#140, at 557:9–

14). By going to ATF, Spike's Tactical had missed out on an opportunity. SA33–34 (#140, at 557:15–560:14).

Leleux's experience with the suppressor informed the decision-making process that the owners of RBT undertook when they considered whether to seek ATF classification of the FRT-15. SA33–34 (#140, at 559:19–560:14). Based in part on that experience, Defendants simply did not seek an ATF classification of the FRT-15. SA33–34 (#140, at 559:12–18).

### 5. Defendants Intended to Lead Their Customers Into Believing That ATF Determined the FRT-15 Was Legal

Although they did not seek an ATF classification, Defendants did elicit the opinions of former ATF officials, like O'Kelly or Rick Vasquez ("Vasquez"), about the FRT-15. A372:24–A373:2. Defendants then trumpeted these opinions to their customers. SA582:9–SA583:21. Notably, however, Defendants omitted key facts from their marketing materials. Nowhere did the marketing materials disclose that the Defendants purchased the '223 Patent from Rounds let alone that ATF had classified the AR-1 as a machinegun. SA294:6–20. Despite touting O'Kelly's expertise, *see* Defendants' Exhibit ("Defs. Ex.") D,[3] at 1:00-1:10, Defendants did not disclose to customers his warning that ATF would deem the FRT-15 illegal, A314:17-23, nor did

---

[3]     In this brief, the Government cites several video files, including its Exhibit 20 and Defendants' Exhibits A and D, that were admitted as evidence during the district court proceedings; these video exhibits can be provided to this Court upon request.

they publish that warning on any of their marketing materials. And at no point did Defendants' website advertise Defendants' deliberate decision to forgo the customary ATF classification process. SA294:6–20.

Moreover, Defendants repeatedly obscured the fact that they never sought an ATF classification for the FRT-15. On numerous occasions, customers emailed RBT and asked whether the FRT-15 was legal. The boilerplate, standard response was that the product was legal. As an example, when a customer asked "[W]ill I get in trouble later down the line for owning this trigger?[,]" DeMonico answered:

> The FRT was conceptualized, designed, and developed specially to meet the legal requirements of a semi-automatic trigger and NOT be classified as a machine gun as defined by the law. Further, we did our due diligence by consulting numerous attorneys and subject matter experts to ensure the FRT complied with the law. Have we created something innovative? Yes! Have we done anything illegal? No!

SA566–67.

By contrast, if – but only if – a customer asked RBT whether ATF had approved the FRT-15, then RBT would provide a slightly different response. SA473–74. RBT would simply state that it had not sought an ATF approval letter, and then repeat its other, boilerplate, standard language. SA473–74. For instance, when a customer asked "Do you have plans to send this to ATF to get a 'letter'?" DeMonico responded:

> To answer your question… We didn't ask ATF for an approval letter for the FRT (Forced Reset Trigger) for several reasons. First, semi-automatic triggers are NOT a regulated item under the NFA or ATF. Second, the law that defines a machine gun (26 USC § 5845(b)) is very clear. The FRT was conceptualized, designed, and developed specially

10

to meet the legal requirements of a semi-automatic trigger and NOT be classified as a machine gun as defined by the law. Further, we did our due diligence by consulting numerous attorneys and subject matter experts to ensure the FRT complied with the law. Have we created something innovative? Yes! Have we done anything illegal? No!

SA473–74.

### 6. Defendants Knew All Along That ATF Would Seek to Stop the Sale of FRT-15s

Defendants knew not only that ATF would consider the FRT-15 an illegal machinegun conversion device but that it would also seek to stop them from selling it. In July 2021, after ATF learned of the FRT-15 and determined it to be illegal, it approached Defendant Maxwell. Defendant Maxwell told ATF that he had been expecting ATF, and that he could now file a lawsuit against the agency, a lawsuit for which he had already prepared pleadings. A373:8–10.

And they were doing so using money from their customers. From the outset, RBT sold FRT-15s with a no-refund policy. A329:15–23; SA247:8–11. The purpose of the policy – which was not stated in the language of the policy itself – was that RBT would need money to challenge the expected ATF determination that the FRT-15 was a machinegun. SA254:18–SA256:3. Defendants did not disclose any of this to their customers when they sold them FRT-15s.

Tellingly, RBT would disclose the rationale for the policy only after a consumer would seek a refund. It would explain that it wanted its customers to support them in

11

that effort, stating that "[i]t is our sincere hope that you stand your ground."[4] SA557–58. Otherwise, RBT would treat a refund request as a breach of contract. *Id.*

### 7. From the Beginning, Defendants Took Steps to Interfere With ATF's Law Enforcement Efforts by "Shredding" Customer Data

Once ATF learns that illegal firearms have entered the market, it will seek to retrieve them. SA34 (#142, at 225:6–16). ATF can do so only if it knows where the firearms are; that is, to do its job, ATF must have a list of customers to whom the firearms were sold. SA34 (#142, at 225:5–230:8).

As soon as they began selling FRT-15s, Defendants implemented a "digital shredding" policy so that ATF would not have that list.[5] It explained that policy to its customers. Either RBT customers, or potential customers, would email RBT and inquire whether ATF would have access to their identifying information. SA553–54; SA555–56; SA568–69. Often, the inquiries would be clear that the customer wanted to hide from ATF. SA554 ("I would rather not have a visit from my local gestapo for exercising my Americanism. Also do you shred/burn the dox? I know a few places that

---

[4]     Customers did not necessarily agree.  As one put it, "[y]our company had better hope that this trigger is finally determined to NOT be a machinegun, or I may need to take legal action against you for having sold me one.  How is that for standing my ground?" SA557–58.

[5]     At the time they were selling FRT-15s, Defendants did not refer to this policy as a "privacy policy" but as a "digital shredding policy." *See* SA555–56; A249–50. They were not explaining this policy as a way of protecting customers' privacy in general; they were, instead, explaining this policy as a way of keeping ATF from finding out who their customers were. *Id.*

get rid of the sales info to protect their customers.")). A standard reply from RBT consisted of: "We have not turned over a customer list to the ATF—we don't even have one to turn over, as we have a *digital shredding policy*." SA555–56, A249–50 (emphasis added).

Defendants continued their "digital shredding" policy well after ATF informed them that the FRT-15 was an illegal machinegun conversion device and well after it was clear to Defendants that ATF was trying to retrieve those devices. A223–25.

### 8. Defendants Refused to Cease Their Sale of the FRT-15s After ATF Formally Declared the Product to Be Illegal

In time, ATF learned that Defendants were selling FRT-15s. It obtained a sample FRT-15, examined that sample, and classified the FRT-15 as a machinegun. SA369–434; SA113 ¶ 16.

On July 27, 2021, ATF officials met with Maxwell and hand-delivered to him a cease-and-desist letter. SA34 (#142, at 214:11–19, 215:4–11, 216:12–13; 218:19–23). The cease-and-desist letter informed RBT that ATF had examined the FRT-15 and determined that it was a machinegun. A259–60; SA435–36. Accordingly, the letter directed RBT to refrain from manufacturing and selling the FRT-15, and to contact ATF within five days to develop a plan to retrieve any FRT-15s that had already been distributed. *Id.*; SA34 (#142, at 215:24–216:4).

Maxwell read the letter and said that he would not comply with it. SA33–34 (#140, at 593:12–13; 594:1–2); *see also* SA34 (#142, at 216:12–17, 219:3–5).

13

After receiving the July 2021 cease-and-desist letter, DeMonico participated in multiple interviews broadcast on social media stating RBT's decision to violate the letter. DeMonico further stated that he and the other Defendants had "no hesitation" in their collective decision not to comply with ATF because, according to him: "Fuck [t]hem." SA591:28; Government's Exhibit 20.

Defendants' defiance of ATF included a social media campaign. A92–96. Online social messaging on how to avoid ATF's efforts to retrieve illegal weapons and devices, and arguing that such devices are not illegal, further undermined ATF's retrieval efforts. SA34 (#142, at 229:1–21); *see also* A92–93 ¶¶ 3–4.

### 9. DeMonico Interfered With an ATF Investigation by Seizing FRT-15s and FRT-15 Parts From a Manufacturing Company That Was Preparing to Turn the Items Over to Law Enforcement

3rd Gen Machine, Inc. ("3rd Gen") manufactured FRT-15s for RBT. A88 ¶ 3; *see also* A332:19–22. On March 26, 2022, ATF executed a search warrant at a 3rd Gen facility in Logan, Utah, and recovered FRT-15s and FRT-15 components. A74 ¶ 2; A89 ¶ 9; *see also* SA33–34 (#140, at 455:23–456:24).

3rd Gen then conferred with DeMonico and Maxwell, and informed them that 3rd Gen was in possession of additional FRT-15s and FRT-15 components. A89–90 ¶¶ 11-12. DeMonico and Maxwell demanded the return of these items, but 3rd Gen told them that the company intended to turn the items over to ATF. A89–90 ¶ 12.

14

On either the afternoon of April 13, 2022, or the morning of April 14, 2022, ATF learned from the U.S. Attorney's Office for the District of Utah that 3rd Gen's counsel wished to surrender the additional FRT-15s. A74–75 ¶¶ 3–4. On April 14, 2022, 3rd Gen's counsel informed ATF that the FRT-15s were on a pallet in a parking lot on the site of the search warrant execution, and that those FRT-15s were available for retrieval by ATF. A75 ¶ 5.

That very same day, DeMonico traveled to 3rd Gen. A351:17–19, A352:4–6. He took a flight from his home to Salt Lake City, rented a U-Haul, and drove to the 3rd Gen facility in Logan. A352:4–13. When DeMonico flew to Utah, he knew that 3rd Gen intended to set aside FRT-15s for ATF's retrieval. SA33–34 (#140, at 509:8–14).

DeMonico arrived at the 3rd Gen facility and walked into the office of Jonathan Robinson, the General Manager for 3rd Gen. A76 ¶¶ 9, 13; A90 ¶ 13; *see also* SA33–34 (#140, at 460:9–13). He told Robinson: "I'm here for my shit." A76 ¶¶ 10, 13; A90 ¶ 15; *see also* A336:14-15; SA33–34 (#140, at 510:4–6). Robinson told DeMonico that ATF was scheduled to arrive the next day to retrieve the FRT-15s, and that Robinson was going to notify ATF. A90 ¶¶ 16–17. DeMonico said that he did not care, and then told Robinson to give him a head start before calling ATF. A76 ¶¶ 13–14; A90 ¶ 17; SA33–34 (#140, at 510:22–24).

DeMonico went ahead and loaded the property set aside for ATF into his U-Haul and drove off. A337:5–11; A90 ¶ 19. He took nearly 2,000 FRT-15s from the 3rd

Gen facility, along with more than 15,000 FRT-15 components that could be used to manufacture additional FRT-15s. SA33–34 (#140, at 463:24–464:1, 511:10–22).

While DeMonico was at 3rd Gen, 3rd Gen's counsel informed ATF that he had just entered 3rd Gen's facility and was attempting to leave with property. A75 ¶ 6. After DeMonico left, Robinson also contacted ATF about this incident. *See* A75–76 ¶¶ 8–10; A77 ¶ 20. DeMonico drove for nearly 700 miles, and made it to just outside Albuquerque, New Mexico, before he was interdicted by ATF. *See* A78–A81; SA33–34 (#140, at 511:12–22).

### 10.   Defendants Took Steps to Hide Their Sale of FRT-15s From the Government

Defendants continued to sell the FRT-15 (as well as a functionally identical device) even after: they received a cease-and-desist letter; the Government executed a search warrant on their contract manufacturer; and the Government seized FRT-15s from DeMonico himself. In late 2022, Defendants obtained an inventory of Wide Open Triggers ("WOTs"). SA135:13–22. A WOT is a knock-off of the FRT-15; it is an identical product. A304:5–15. As such, it is also an illegal machinegun conversion device. SA437–51. Defendants began to sell WOTs in November 2022. SA33–34 (#140, at 475:18–20).

Defendants used the U.S. Postal Service ("USPS") to mail WOTs to customers purchasing WOTs. SA33–34 (#140, at 475:20–22). To ship them through the USPS, though, Defendants did not use their company name, "Rare Breed Triggers"; instead,

they used the names of two fake companies, "Red Beard Treasures" and "Red Barn Tools." A328:6–A329:7; A100:9–14; A101:18–23; *see also* SA35–44; A63–73.

## B. Proceedings in the District Court

### 1. The Filing of the Complaint

The United States commenced this action on January 19, 2023, seeking a temporary restraining order along with preliminary and permanent injunctions under the Anti-Fraud Injunction Act. A25. The complaint alleged that the Defendants engaged in ongoing mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1345, a conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, as well as a conspiracy to defraud the United States in violation of 18 U.S.C. § 371. A29. Accompanying the complaint was a motion for a temporary restraining order ("TRO") and a preliminary injunction. SA6 (#5).

### 2. The Grant of the TRO and Scheduling of a Preliminary Injunction Hearing

The district court held an *ex parte* hearing on January 24, 2023, granted the United States' motion for a TRO shortly thereafter, and scheduled a hearing for February 2, 2023, to address why the United States' application for a preliminary injunction should not be granted. SA8 (Jan. 28, 2023 Minute Entry). Defendants appeared by counsel and, on February 2, 2023, sought conversion of the upcoming hearing to a status conference, proposed a schedule for a preliminary injunction

hearing, and agreed to an extension of the existing TRO consistent with the proposed schedule. SA8 (#15).

The district court granted Defendants' request to convert the February 2, 2023 hearing to a status conference, directed briefing on Defendants' planned motion to dismiss for lack of personal jurisdiction, and scheduled a preliminary injunction hearing for April 26, 2023. SA8–9 (Feb. 3, 2023 Minute Entry). The district court also kept the TRO in place during the pendency of a preliminary injunction hearing. SA8–9 (Feb. 3, 2023 Minute Entry).[6]

### 3.  Defendants' Misrepresentation to the District Court in Connection With the Motion to Dismiss for Lack of Personal Jurisdiction

Defendants' motion to dismiss for lack of personal jurisdiction was fully briefed on March 2, 2023. SA11–12 (##23–29).[7] Central to those challenges was the question whether any of the Defendants – or any of their dealers – sold FRT-15s in New York. In their briefing on their motion to dismiss the action for lack of personal jurisdiction,

---

[6]    The district court later extended the preliminary injunction hearing date and the TRO on several occasions. The date for the hearing was eventually set for August 1, 2023, and the TRO was extended to October 2, 2023 (with the caveat that it would no longer remain in effect if the district court's decision rendered it moot before that date). SA19 (May 26, 2023 Minute Entry); SA31 (Aug. 11, 2023 Minute Entry).

[7]    In the district court, Defendants withdrew their challenge to personal jurisdiction while the parties were briefing the matter. SA15 (#44). In any event, they have not, in this appeal, challenged the district court's exercise of personal jurisdiction over them or its determination that venue was proper in the Eastern District of New York.

Defendants claimed that Rare Breed Firearms "wasn't . . . involved in sales of the FRT-15 or WOT[.]" SA86 (quoting Defendants' moving papers). Rare Breed Firearms, they claimed, only sold "swag," like t-shirts and hats. SA86.

On March 17, 2023, the district court held oral argument on Defendants' motion. SA14 (Mar. 17, 2023 Minute Entry). Several days later, the district court issued an order to show cause notifying the parties that it was considering *sua sponte* transferring the action to another district, and soliciting letter briefing from the parties by March 29, 2023, as to why the action should not be transferred. SA14 (#36).

The parties filed their respective submissions on March 29, 2023. SA14 (##38-40). Defendants argued that dismissal would still be appropriate in the first instance, but short of that, the Western District of Texas, the Middle District of Florida, or the District of North Dakota would be permissible transferee venues. SA14 (#38).

Notably, the United States' submission alerted the district court to newly-discovered evidence that Rare Breed Firearms had in fact shipped FRT-15s replacement parts to New York on multiple occasions, including shipments to addresses in the Eastern District of New York. SA 51 ¶ 5; SA53 ¶ 22; SA56 ¶ 26. Two days later, on April 1, 2023, the United States notified the district court that it had found additional evidence that Rare Breed Firearms shipped FRT-15 replacement parts to New York. SA15 (#43).

### 4.       The Denial of the Transfer Motion

The district court held a status conference on April 4, 2023, during which Defendants' counsel indicated Defendants may withdraw their motion to dismiss for lack of personal jurisdiction. SA66:4-67:5. The district court construed Defendants' March 29 submission as a motion to transfer venue to the Western District of Texas, and ordered the parties to proceed to discovery during the pendency of the transfer motion. SA15 (Apr. 4, 2023 Minute Entry).

Two weeks later, on April 18, 2023, the district court denied Defendants' motion to transfer venue. SA75–106. In denying Defendants' motion, the district court observed that Defendants' admission by counsel contradicted many factual assertions made by Defendants. SA89–90.[8]

---

[8]      Before these misrepresentations were discovered, the district court stated that it was inclined to transfer the case. SA87. The misrepresentations made by Defendants to the district court in connection with their motion included the statement in Leleux's declaration that "RBT is not aware of any instance where a dealer sent an FRT-15 or WOT to any person or address in New York." SA47–48 ¶ 14; *see also* SA33–34 (#140, at 574:10-22).

That misrepresentation to the district court directly contradicted statements that Leleux had made on behalf of RBT. For instance, on January 11, 2021, Leleux sent an email to a customer confirming that Big Daddy Unlimited ("BDU") (their exclusive dealer) "has stated they plan to sell to all 50 states." SA560–62; SA33–34 (#140, at 570:11–571:24). He directed an RBT customer to purchase an FRT-15 from BDU; even though RBT would not ship into the customer's state, BDU would. *Id*. This was not an isolated incident. On January 9, 2021, Leleux told another customer that BDU "has stated that they will sell in all states," and that "[t]he easiest method to acquire one will be to purchase through them." SA563; SA33–34 (#140, at 569:15–570:9) (confirming that "Charles" is an alias used by Leleux in consumer-facing emails). Around this same time, on January 3, 2021, DeMonico told a

### 5. The Preliminary Injunction Hearing

On April 28, 2023, Defendants filed their opposition to the United States' motion for a preliminary injunction. SA16 (#50). The United States filed its reply in support of its motion for a preliminary injunction on May 8, 2023. SA18–19 (#56).

On May 26, 2023, the district court held a status conference and adjourned the preliminary injunction hearing to August 1, 2023, with summations and oral argument to take place on August 15, 2023. Defendants (at this point represented by new counsel) also submitted a sur-reply to the United States' motion for a preliminary injunction on June 16, 2023. SA21 (#70). The parties completed expedited discovery on July 27, 2023, and the preliminary injunction hearing proceeded as scheduled on August 1 and 2, 2023. SA29–30 (Aug. 1, 2023 & Aug. 2, 2023 Minute Entries).

On September 5, 2023, the district court issued the 129-page decision. A112–240. This appeal followed. A23 (##139, 141), 24.

## C. The District Court's Decision

In its decision, the district court granted the United States' request for a preliminary injunction. A112–A240. After recounting the procedural history of the

---

customer from California (yet another state within the "restricted shipping zone") that the customer may have some luck purchasing an FRT-15 through BDU. SA559.

During the preliminary injunction hearing, Leleux confirmed that Defendants had an understanding that BDU would ship FRT-15s to all fifty states, and during his live testimony in court, effectively conceded that his earlier representation to the district court was false. SA33–34 (#140, at 574:21–575:5). The district court discussed Leleux's declaration in its decision. A196–99.

case and detailing the evidence presented, the court began its legal analysis with an examination of the mechanical operation of the FRT-15 itself. A146–73. The court noted that the FRT-15 is a drop-in trigger replacement assembly designed to be used in an AR-15 type rifle. A128. The court's focus was on the definition of a machinegun in the National Firearms Act, which states that a machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." A147–48 (citing 26 U.S.C. § 5845(b)). The court then went on to find, based on the factual record and testimony of experts, that a rifle fitted with an FRT-15 could fire more than one shoot with each pull – or function – of the trigger. A161–73. The court thus held that "the Government is likely to succeed on the merits of its contention that the FRT-15 is an illegal machinegun." A173.

The court next turned to whether the United States met its burden to show, pursuant to 18 U.S.C. § 1345, that Defendants were violating or about to violate the mail and wire fraud statutes, 18 U.S.C. § § 1341, 1345, 1349, and the statute outlawing conspiracies to defraud the United States, 18 U.S.C. § 371. A174–231

In addressing the mail-and-wire-fraud-based claims, the court began by examining whether the United States adduced sufficient evidence to show that Defendants carried out a scheme with the requisite intent. A176–99. For the court, the scheme at issue was whether Defendants marketed the FRT-15 to their customers by

22

withholding from them material information. As the court put it, Defendants "reaped $39 million in sales" from their customers "only after Defendants intentionally withheld material information in their possession bearing directly on the truth of their marketing claims about the FRT-15's legality." A179. The court also addressed Defendants' argument that *Ciminelli v. United States*, 598 U.S. 306 (2023), controlled, and concluded that *Ciminelli* (which concerned an intangible property interest) has no bearing on mail and wire fraud schemes with money as the object. A175 n.32.

The court found that Defendants "lied to their customers when they told them that the FRT-15 was "absolutely, positively" a legal trigger." A185. That finding was primarily based on the evidence that Defendants knew that the ATF had found that a prior iteration of the FRT-15, the AR-1, was illegal. A179–85. Yet, as the court put it, Defendants "concealed that information from their customers." A180.

The court rejected Defendants' arguments that their claims about the legality of the FRT-15 were made in good faith as they were based in part on the opinions of experts. A185–96. The court noted that O'Kelly specifically warned Defendants that ATF would find the FRT-15 to be illegal, and yet Defendants still withheld that information from their customers. A186–87. The court also noted that Vasquez, another of Defendants' experts, had classified products very much akin to the FRT-15 as illegal machineguns while working for ATF. A187–90. Yet again, Defendants did

not disclose these facts to their customers; instead, they used that expert to claim that the FRT-15 was legal. *Id.*

Finally, as to Defendants' claims that they acted in good faith at all times, the court recalled Defendants' submission of Leleux's false declaration. A196–99. The false declaration gave the court "further cause for concern about [Defendants'] overall credibility and veracity." A199.

The court moved on to whether Defendants' misrepresentations to their customers were material. A199–212. In so doing, the court focused on Defendants' omissions. A200–03. It observed that, because Defendants "made a deliberate choice to repeatedly tout the 'former ATF' credentials of their experts and the 'due diligence' they conducted in their assurances to customers that the [FRT-15] was not a machinegun," the information they failed to disclose – for example, that at least one of their experts warned that ATF would consider the device illegal – was material to their customers. A202. As the court noted, "[a]s a threshold matter, the implicit legality of the product being sold is central to nearly every bargain." A201.

Having made these findings, the court held that "the Government is likely to succeed on the merits of its claims of mail and wire fraud." A212.

The court next analyzed the United States' allegations that Defendants were conspiring to "defraud the United States" in violation of 18 U.S.C. § 371. A213–31. Relying on longstanding precedent, the court held that such a conspiracy, commonly

referred to as a *Klein* conspiracy, is one that is directed towards interfering with a lawful government function by way of deceit. A213–15. As with the mail and wire fraud claims, the court found that *Ciminelli* does not foreclose a *Klein* conspiracy claim, particularly in light of this Court's precedent interpreting 18 U.S.C. § 371. A214 n.44.

The court considered whether Defendants interfered with ATF's lawful function of tracking and confiscating illegal machineguns. A215–17. It found that they did so, and highlighted three aspects of Defendants' conduct that supported this finding. A217–30. First, the court held that Defendants used false return addresses on packages of trigger devices that they sent through USPS. A218–23. Second, the court noted that Defendants employed a "digital shredding policy" and intentionally destroyed records of their sales of FRT-15s. A223–25. Third, the court emphasized an incident involving a company that manufactured FRT-15s for Defendants. A226–30. As part of its ongoing efforts to stop the sale of FRT-15s, the Government had executed a search of that manufacturer and had seized products from one of its facilities. *Id*. The court found that DeMonico interfered with that part of the Government's investigation of the FRT-15. *Id*.

The district court thus concluded "that the Government is likely to demonstrate at trial on the merits that Defendants completed at least one overt act in furtherance of

a conspiracy to obstruct ATF's lawful jurisdiction to investigate Defendants' manufacture and distribution of illegal machineguns." A231.

The court ended its analysis by addressing whether a grant of a preliminary injunction would avert irreparable harm; whether, on balance of hardships to the parties, a preliminary injunction was appropriate; and whether a preliminary injunction would further the public interest. A231–39. It found in favor of the United States on each of those points. *Id*.

## SUMMARY OF THE ARGUMENT

Defendants have offered nothing to warrant this Court's disturbing the district court's careful and detailed findings that support its decision to grant the United States preliminary relief.

There is abundant evidence in the record to establish that Defendants hid critical facts from their customers when they convinced those customers that the FRT-15 was a legal product. And there is abundant evidence in the record to reject any claim that Defendants acted in good faith by touting the opinions of experts about the legality of the FRT-15. After all, Defendants hid from their customers that at least one of those experts "guarantee[d]" them that the FRT-15 was illegal and another had determined, while working at ATF, that similar products were illegal. It thus cannot be said the district court abused its discretion in finding that Defendants committed ongoing fraud.

26

Likewise, the district court did not abuse its discretion in finding a substantial likelihood of success on the merits of the claim that Defendants conspired to defraud the United States. As a threshold matter, 18 U.S.C. § 371 (the statutory predicate for the conspiracy claim) is well grounded in Supreme Court and Second Circuit precedent. Moreover, there is ample support in the record showing that Defendants conspired to defraud the United States by interfering with ATF's efforts to prevent distribution of the FRT-15 and retrieve devices that had already been sold.

Nor did the district court err in holding that *Ciminelli* does not undermine the Government's theories of fraud. *Ciminelli*, which addressed specific types of fraud targeting non-traditional property interests, does not bear on mail and wire fraud schemes targeting money. Moreover, *Ciminelli* construed only the mail and wire fraud statutes, and does not apply to the much broader *Klein* conspiracy at all.

Thus, this Court should affirm the district court's grant of a preliminary injunction.

## ARGUMENT

## THE DISTRICT COURT'S GRANT OF A PRELIMINARY INJUNCTION SHOULD BE AFFIRMED

### A.    Standard of Review

This Court reviews the grant of a preliminary injunction for abuse of discretion. *See, e.g., Citigroup Global Mkts., Inc. v. VCG-Special Opportunities Master Fund*

*Ltd.*, 589 F. 3d 30, 34 (2d Cir. 2010). A district court abuses its discretion if it makes an error of law or rests its decision on a clearly erroneous finding of fact. *Id*.

The district court granted the preliminary injunction here pursuant to Anti-Fraud Injunction Act. Under § 1345, a court may enjoin a defendant who is "violating or about to violate" a predicate statute, among them the mail or wire fraud statutes, *see* 18 U.S.C. §§ 1341, 1345, 1349, or the general conspiracy statute as it applies to conduct that defrauds the United States, *see* 18 U.S.C. § 371.

It is the view of the United States that it need only establish probable cause to believe that a defendant is "violating or about to violate" the predicate statutes for a court to enjoin that defendant pursuant to § 1345. *See, e.g., United States v. William Savran & Assocs.*, 755 F. Supp. 1165, 1177 (E.D.N.Y. 1991). The Supreme Court, in *Luis v. United States*, 578 U.S. 5 (2016), suggested that a probable cause standard for § 1345 injunctions is proper. There, the Supreme Court reviewed a § 1345 injunction that restrained a defendant's ability to use assets not traceable to an underlying crime to pay for an attorney. The district court had granted the injunction based on probable cause. Although the Supreme Court held that the injunction violated the defendant's Sixth Amendment right to counsel of her choice, nowhere did the Court exhibit any disagreement with the district court's use of a probable cause standard to impose the restraint in the first place. To the contrary, the Court noted that district courts crafting § 1345 injunctions that restrained assets would thereafter need to distinguish between

tainted and innocent funds and that, in so doing, the courts could employ a probable cause standard. *See id*. at 22–23.

Rather than employing the probable cause standard, the district court here employed the default standard for a preliminary injunction. *See* A145–46 n.13. That is, the district court analyzed whether the United States established, by a preponderance, that it had a likelihood of success on the merits of its claim.[9]

Although the Government disagrees with the district court's approach, this Court need not decide whether the appropriate standard for a § 1345 injunction is "probable cause" or is the default standard for preliminary injunctions because the district court correctly held that the United States had met its burden even under the standard applied by the district court.

As to the district court's factual findings, this Court's review is deferential. *See, e.g.*, *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 44 (2d Cir. 2000). It is the province of the district court to weigh any conflicting witness testimony and to draw inferences from that testimony. *See, e.g.*, *id.* "The mere presence of evidence to support an inference contrary to that drawn by the trier of fact does not mean that the factual findings were clearly erroneous." *Id.*

---

[9] Defendants do not challenge any other element underlying the preliminary injunction. That is, Defendants do not challenge whether the conduct at issue is ongoing, whether the United States has shown (or even needs to show) irreparable harm, or whether any balancing of equities favors the issuance of an injunction.

**B.      The District Court Did Not Abuse Its Discretion in Finding
          That Defendants Committed Ongoing Mail and Wire Fraud**

The United States sought to enjoin, pursuant to the Anti-Fraud Injunction Act, Defendants' scheme to commit mail and wire fraud. The district court did not abuse its discretion in finding that the United States met its burden.

**1.      The Elements of Mail and Wire Fraud**

Defendants contest only the intent element of mail and wire fraud, claiming that the district court erred in finding that the United States met its burden to prove Defendants acted with the requisite intent. *See generally* Opening Brief of Appellants ("Defs. Br."). The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires. *See, e.g.*, *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). As to the first element, the United States was required to prove (a) a scheme to defraud (b) that Defendants carried out with the requisite intent and (c) that was material. *See id.*[10]

A scheme to defraud, though not defined in the statutes themselves, is understood to mean any plan to deprive someone of money or property by way of trick, deceit, or overreaching. *See id.* at 115. Such a plan can rest on affirmative

---

[10]     Defendants do not challenge the district court's findings concerning materiality. Nor do they contest whether they used the mails or the wires to further a fraudulent scheme. So, the discussion here applies to both the mail and wire fraud counts. In addition, Defendants do not contest whether there was a conspiracy to commit mail or wire fraud.

misrepresentations of fact; it can also rest on omissions of fact. *See id.* at 119. That is, a defendant has a duty to disclose facts "where [that] defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading." *Id.* Failure to give the whole story may be fraud, especially when a defendant actively conceals information. As the Supreme Court itself has said, "half-truths – representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016) (analyzing the federal False Claims Act). *See also United States v. Petrossi*, 786 F. App'x 286, 288-89 (2d Cir. 2019) (noting that this Court has long recognized that half-truths can be misrepresentations in the securities law context); *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022) ("A half truth, or what is usually the same thing as a misleading omission, is actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleading and the disadvantage of the misled.") (internal alterations omitted).

### 2. Defendants Mischaracterize the District Court's Analysis of the Fraud Claims in This Case

Defendants' argument that the district court erred in its findings as to their intent is based on a mischaracterization of the fraud. Defs. Br. at 46–49. In their view, the district court's decision rests on the basis of a mere disagreement between their hired experts and ATF. Defs. Br. at 44. But the fraud is not because Defendants disagreed

with ATF. Instead, the fraud is because Defendants made a representation "only so far as it goes, while omitting critical qualifying information." *Escobar*, 579 U.S. at 188. Defendants simply do not acknowledge that the fraud is about omissions.

Defendants' entire legal analysis of fraudulent intent, then, is something of a misdirection. It is an analysis addressed to a different case altogether. As such, that analysis never addresses whether Defendants intended to hide facts from their customers (which they did) and whether they hid those facts in good faith (which they did not).

Ultimately, Defendants' scheme was to mislead their customers about the legality of the FRT-15. Defendants carried out this scheme by telling their customers half-truths. As viewed by the district court, Defendants' scheme was one involving omissions. A200–01. Indeed, Defendants reaped $39 million in sales of the FRT-15 "only after Defendants intentionally withheld material information in their possession bearing directly on the truth of their marketing claims about the FRT-15's legality." A179.

### 3. The District Court Did Not Abuse Its Discretion in Finding That Defendants Intentionally Withheld Key Facts From Their Customers

Defendants touted the FRT-15 as a brand-new, innovative product that was unquestionably legal. The district court noted, for instance, that Defendants posted videos on their website that touted the FRT-15 as legal. A135–36. One of those

videos[11] showed Maxwell, who told consumers that "two former ATF employees," whom he called "two of the most significant subject matter experts in the industry," had stated that the FRT-15 was legal. Defs. Ex. A. In another video, also on Defendants' website, DeMonico interviewed O'Kelly, one of these experts. DeMonico repeatedly emphasized that O'Kelly was a former ATF agent. DeMonico then asked him, "Here is the million-dollar question: is the FRT a machinegun?" Defs. Ex. D. O'Kelly responded, "Absolutely not." Defs. Ex. D.

At the same time, Defendants sent emails to customers who had asked about the legality of the FRT-15 saying:

> Have we created something innovative? Yes! Have we done anything illegal? No! We've found a way to bring a new semi-automatic trigger to market while staying within the parameters as set forth by the law.

SA566–67; A136.

Defendants made all of these statements knowing that seeking an ATF classification of the legality of a product was the "customary" process for those about to put products like the FRT-15 on the market. SA33–34 (#140, at 504:3–6); SA453:27–SA454:4; *see also* A126.

Taken together, the district court viewed these statements as explicitly and implicitly conveying the message to consumers that the FRT-15 was a brand-new

---

[11]     The video exhibits cited in this paragraph can be provided to this Court upon request. *See infra* n.3.

product that was legal, and that the ATF had approved or would approve. Those statements were not the whole story, however. And that – the rest of the story – is the crux of the fraudulent scheme here, as the district court found.

Throughout its opinion, the district court highlighted the many critical, material facts, that Defendants hid from their customers. *See* A144; A179–91. The FRT-15 was not new; it was based on the AR-1, which ATF had already declared to be illegal. A179-85. The inventor of the AR-1 and the FRT-15 (Rounds) did not want to sell the FRT-15 because he believed that ATF would determine that the FRT-15 was illegal, a fact never disclosed to Defendants' customers. *Id.* Defendants also did not tell their customers that when O'Kelly first examined the FRT-15, he told Defendants that he would "guarantee" that ATF would consider the product illegal. A186–87. Defendants never submitted the FRT-15 to ATF for classification as to its legality. And they did not do so, as the district court found, because they did not want to miss out on a big moneymaking opportunity. A190–91. Instead, they "simply assure[d] RBT's customers that the device was 'legal' precisely because they knew that allowing ATF to examine their device *before* bringing it to market might kill their proverbial golden goose." A191 (emphasis in original).

Without these facts, any affirmative statements that the Defendants made about the legality of the FRT-15 were misleading half-truths, as the district court found. Such statements were, in other words, false, just as false as statements (1) saying that there

are two roads near a property, but not saying that a third road would bisect the property, *see Escobar*, 579 U.S. at 189; (2) touting the potential for a future increase in income from a real estate venture, but failing to note that current income was below expectations, *see Autuori*, 212 F.3d at 119; or (3) offering to buy or sell a futures contract but not disclosing that the offer would be cancelled, *see Chanu*, 40 F.4th at 541.

These half-truths were intentional. Defendants' customers were concerned about the legality of the FRT-15. They did not want to spend their money on an illegal product. Defendants knew that. Otherwise, they would not have set up an elaborate marketing machine – with a website, videos, and animations – meant to convince potential customers that the product was legal. As the district court reasoned, "had Defendants properly informed their customers that, for $380, they could receive an FRT-15 that was likely subject to eventual seizure by the ATF, with a corresponding risk of criminal prosecution, few, if any, customers would have purchased one." A202. In any event, many of their consumers told them about their concerns. In email after email, quoted at length by the district court, consumers expressed a fear that they would be wasting their money on an illegal product. A205–11. To get money from their consumers, then, Defendants told them a half truth.

35

4. **The District Court Did Not Abuse Its Discretion in Finding That Defendants' Purported Reliance on Experts Was Not in Good Faith**

Much of Defendants' argument rests on the assertion that they relied on the opinions of several of their experts, in good faith, when they told their customers that the FRT-15 was legal. Defs. Br. at 50–55. The district court acknowledged that Defendants relied on "opinions they obtained from their retained 'experts,' all former ATF officials," A179, but appropriately rejected that argument because, despite what their experts told Defendants, they knew that they were defrauding their customers. A185–86. The court focused on what these experts told Defendants and how Defendants ignored critical facts undermining the experts' views and then hid those same critical facts from their customers. A185–90.

Properly analyzed, then, Defendants' reliance on their experts is not evidence of good faith. Rather, Defendants parroted the portions of their experts' opinions which furthered their scheme while ignoring those that did not, which was itself part and parcel of the fraud; it is thus evidence of their intent to defraud their customers by way of omission.

Take Defendants' use of O'Kelly. Defendants make much of his background, experience with ATF, and general expertise concerning firearms. They presented him as someone whose independent views their customers could trust. But they only provided their customers with his view that the FRT-15 is "absolutely" legal. As the

district court explained, they never told their customers that he also viewed it as a "guarantee" that ATF would deem the FRT-15 illegal. A186–87. In other words, they told half of the O'Kelly story.

Nor did Defendants use Vasquez in good faith. Vasquez was another of the experts Defendants relied on. They contacted Vasquez in January 2021, very soon after they had begun selling the FRT-15. *See* SA31 (#123, at 2:20–3:19). Vasquez wrote Defendants a letter, offering his view that the FRT-15 was legal and stating that "*there is no verifiable history* of ATF opinions to support this trigger being classified as a machinegun, both in general and specifically pertaining to the underlying design." SA344 (emphasis added). But that statement is not true. Vasquez knew it and record evidence shows that Defendants did as well, as the district court details. A187–90. First, it was Vasquez himself who submitted the AR-1 – the FRT-15's predecessor – for an ATF classification on behalf of Rounds. SA489; SA34 (#142, at 115:12–23). And of course, ATF determined the AR-1 to be illegal – a verifiable, historical example of an ATF opinion. Second, Defendants first contacted Vasquez after they received an email from a customer who had, years before, developed a trigger much like the FRT-15. SA564–65. The customer stated that his trigger system "had the same forced reset function as your Rare Breed FRT-15 system" and ATF concluded that the product was a machinegun. *Id.* The system at issue in this email was designed by Hunter Kinetics. SA511–23; SA524–45; SA546–52; SA34 (#142, at 129:18–143:10).

37

Vasquez himself was directly and personally involved in determining that the Hunter Kinetics trigger was illegal when he was with ATF. SA34 (#142, at 129:18–143:10). Again, Defendants and Vasquez were well aware of a verifiable, historical example of an ATF opinion that deemed a product like the FRT-15 to be illegal.

As with O'Kelly, Defendants use Vasquez to tell half a story. They trumpet Vasquez as an expert, with extensive ATF experience, who views the FRT-15 as legal in part because there is no "verifiable history of ATF opinions" concerning such products. What they do not trumpet, however, is that there is in fact a "verifiable history of ATF opinions," some of which Vasquez himself was involved in, stating that products just like the FRT-15 were *illegal*.

### 5. Defendants' Claim of Good Faith With Respect to Their Customers is Contradicted by Their Lack of Good Faith in Their Submissions to the District Court Itself

The district court's determination that Defendants did not act in good faith was based, in part, on its assessment that Defendants misled the court by filing a declaration in which Leleux falsely claimed he was unaware of any instance where RBT sold an FRT-15 in New York. A196–99. That determination, in other words, was based in part on the district court's assessment that Defendants lacked credibility as a general matter. *Id*. A district court's credibility finding is entitled to substantial deference on appeal. *See, e.g.*, *United States v. Arterbridge*, 374 F.2d 506, 507 (2d Cir. 1967). It thus follows

that the district court's finding as to Defendants' good faith should not be disturbed here.

## C. The District Court Did Not Abuse Its Discretion in Finding That Defendants Engaged in a *Klein* Conspiracy

In the district court, the United States also sought to enjoin Defendants from continuing to engage in a conspiracy to defraud the United States in violation of 18 U.S.C. § 371, which is often referred to as a *Klein* conspiracy. The district court did not abuse its discretion in finding that the United States met its burden.

### 1. The Elements of a *Klein* Conspiracy

A *Klein* conspiracy charge relies on the general conspiracy statute, which states:

> *If two or more persons conspire* either to commit any offense against the United States, or *to defraud the United States, or any agency thereof in any manner or for any purpose*, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 371 (2022) (emphasis added). Unlike a typical conspiracy charge, a *Klein* conspiracy focuses on the phrase "to defraud the United States[.]" *United States v. Klein*, 247 F.2d 908, 920 (2d Cir. 1957). "To prove a conspiracy under the 'defraud clause,' the government must establish '(1) that the defendant entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy.'" *United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020) (quoting *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996)) (internal brackets omitted).

## 2.    Defendants' *Klein* Conspiracy

Defendants brought a machinegun conversion device to market knowing that ATF would try to stop sales,[12] made as much money from those devices before ATF caught on, and then frustrated ATF's attempts to retrieve them once the scheme was uncovered. Their failure to submit the FRT-15 for classification was not a case of benign neglect or principled noncompliance with a voluntary process. Rather, it was a calculated maneuver to forestall the inevitable machinegun designation; Defendants did not want ATF to kill their golden goose, so they hid what they were doing. *See* A191.

As the district court noted, once ATF caught on to the scheme, Defendants thwarted the agency at several critical junctures. *See* A217–30. For example, ATF intended to recover FRT-15s that Defendants had already distributed, and requested that Defendants contact ATF to help develop a plan to retrieve sold devices. A260; SA436. Instead of cooperating, Defendants elected to keep their "digital shredding" policy in place – knowing that the sales data they were destroying was vital to ATF's retrieval efforts. A223–25. They also attempted to hide future sales from the

---

[12]    Defendants' half truths in furtherance of their mail and wire fraud scheme also serve as evidence of their *Klein* conspiracy. Indeed, rapid and surreptitious distribution of FRT-15s to consumers (which Defendants managed only by relying on these half truths) interfered with ATF's "power to investigate and enforce the federal prohibition on the transfer or possession of a machinegun." *Cf.* A216 (citing 28 C.F.R. § 0.130(a)(1), (2)).

government by shipping FRT-15s under fake company names. A218–23. And they snatched FRT-15s up from their manufacturer's facility in Utah once they became aware that an ATF seizure was imminent. A226–30. This, in broad strokes, is the *Klein* conspiracy here.

### 3. Section 371 Forms a Valid Basis for a Preliminary Injunction Under the Anti-Fraud Injunction Act

The district court did not abuse its discretion in relying on Section 371 to enjoin Defendants' interference of a lawful ATF function under the Anti-Fraud Injunction Act. As the district court held, the term "defraud" in Section 371 has historically been construed more expansively than in the mail and wire fraud statutes because it is "designed to protect the integrity of the United States and its agencies." A213 (quoting *United States v. Nersesian*, 824 F.2d 1294, 1312 (2d Cir. 1987)).

This Court was not so long ago confronted with a challenge to the scope of the defraud clause, and affirmed that it is "bound to follow both the law of the Circuit and long-lived Supreme Court decisions that have definitively adopted and reaffirmed the expansive reading of § 371 given by courts." *Atilla*, 966 F.3d at 118 (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal quotation marks omitted); *see also Coplan*, 703 F.3d at 61–62 ("Although the defendant argue forcefully on appeal that we should . . . pare the body of § 371 precedent down to its core, such arguments are properly directed to a higher authority. As an intermediate appellate court, we are bound to follow the dictates of Supreme Court precedents[.]") (internal

citation and quotation marks omitted). Given this, "it is now well established that § 371 'is not confined to fraud as that term has been defined in the common law' but reaches 'any conspiracy for the purpose of . . . obstructing or defeating the lawful function of any department of Government.'" *Coplan*, 703 F.3d at 60–61 (quoting *Dennis v. United States*, 384 U.S. 855, 861 (1966)).

Defendants attack the validity and reach of Section 371 by arguing that the district court "effectively create[d] a common law crime" that cannot be reconciled with Supreme Court precedent, *see* Defs. Br. at 62, but this is not accurate. Over a century ago, the Supreme Court interpreted the language of Section 371's predecessor broadly to include within its scope more than just "actual financial or property loss." *Haas*, 216 U.S. at 479–80; *see also* Rev. Stat. § 5440 (1901) ("If two or more persons conspire . . . *to defraud the United States in any manner or for any purpose*, and one or more of such parties do any act to effect the object of the conspiracy all the parties to such conspiracy shall be liable.") (emphasis added). Years later, the Supreme Court reviewed that same statutory text and clarified:

> To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

*Hammerschmidt*, 265 U.S. at 188 (emphasis added). In 1948, Congress codified Section 371 in its current form using virtually identical language. *See* Act of June 24, 1948, Ch. 645, 62 Stat. 701; 18 U.S.C. § 371. Because "Congress is presumed to be aware of [a] . . . judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *see New York v. DHS*, 969 F.3d 42, 64 (2d Cir. 2020) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)), *Haas* and *Hammerschmidt*'s construction of "defraud" governs Section 371's text. Thus, it cannot be said that a *Klein* conspiracy is a "common law crime" in light of Congress' adoption of the Supreme Court's construction into the current text of the statute.

### 4. Defendants Used Dishonest Means to Interfere With ATF Functions

The district court found that the United States presented sufficient evidence that Defendants used dishonest means to interfere with a lawful ATF function. A217–25. This finding was based on two discrete events: (1) Defendants' use of fictitious return addresses when shipping WOTs through USPS; and (2) Defendants' implementation of a "digital shredding policy" after becoming aware of ATF's retrieval efforts. A216-25. This Court should affirm this finding because the district court did not abuse its discretion in reaching this decision.

The district court's finding that Defendants used fake company names on shipping labels in order to evade ATF detection has ample support in the record. The parties agree that Defendants had a practice of using fictitious names on USPS labels,

but not UPS labels. *See* A328:1–329:6. Defendants' proffered explanation was that this was merely a matter of loss prevention and consumer privacy protection in light of USPS's perceived failure to safeguard delivered packages. Defs. Br. at 38–39; *see also* A329:11–14. The district court found this explanation wanting for multiple reasons. First, Defendants were aware of documented thefts with UPS (that is, privately shipped) deliveries, *see* SA18–19 (#56-1); SA475, but only implemented this practice with shipments through USPS. Second, Defendants only began using fictitious names on USPS packages in the Fall of 2022 – *after* they became aware earlier that year that ATF was making active efforts to seize FRT-15s. *See* A360:5–7. Third, the rationale was incoherent, as using the word "treasures" would make it *more* likely that thieves would steal packages bearing that word, not less. After considering this evidence, the district court correctly found that it was likely that Defendants implemented this dishonest practice to frustrate ATF's efforts to retrieve WOTs.

Defendants now seek to overturn this finding because they are displeased with the way that the district court weighed the evidence and drew inferences from it. Specifically, Defendants take issue with the inferences that the district court drew with respect to their choice of shipping carriers, as well as the nature and timing of their decision to use fake names on packages. Defs. Br. at 40–43. In their view, the district court's finding was clearly erroneous because the evidence lends "equal or superior weight to an innocent explanation." Defs. Br. at 44. But a mere disagreement with an

inference drawn forms no basis for disturbing the district court's factual finding. *See, e.g.*, *Principal Nat'l Life Ins. Co. v. Coassin*, 884 F.3d 130 (2d Cir. 2018) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *Ceraso v. Motiva Enterprises, LLC*, 326 F.3d 303, 316 (2d Cir. 2003) ("Even if the appellate court might have weighed the evidence differently, it may not overturn findings that are not clearly erroneous."). This Court only reviews findings of fact for abuse of discretion. The district court did not abuse its discretion here, and its finding should stand.

The district court also did not abuse its discretion in finding that Defendants' continued use of their digital shredding policy after learning of ATF's retrieval efforts was dishonest. A223–25. For Section 371, "[a]*ll* that is necessary is that the scheme had the object of making it more difficult for [an agency] to carry out its lawful functions and that the scheme depend on 'dishonest or deceitful means.'" *United States v. Shellef*, 507 F.3d 82, 104 (2d Cir. 2007) (emphasis added). That is precisely what Defendants did here. At the preliminary injunction hearing, DeMonico testified that Defendants activated a function in their internal systems that he knew would render information such as names and addresses unavailable after a certain amount of time. A325:1–A326:17. Defendants in fact touted this to consumers to assuage concerns that ATF would be able to track FRT-15 purchasers down. SA553–54; SA555–56; SA568–69. Once ATF served the first cease-and-desist letter on July 27, 2021, Defendants

knew that ATF intended to retrieve FRT-15s that had already been distributed. The letter stated, in language set off in bold typeface: "Contact ATF within five days of receipt of this letter to develop a plan for addressing those machineguns already distributed." A260. Moreover, by March 2022, Defendants knew that ATF had an active criminal investigation that resulted in the seizure of FRT-15s at a 3rd Gen facility. Yet they maintained the digital shredding policy.

Defendants argue that the district court erred in finding that their maintenance of the digital shredding policy after receiving ATF's cease-and-desist letter in July 2021 was a dishonest act. The crux of their argument is that the digital shredding policy could not form a basis for a *Klein* conspiracy because Defendants neither made affirmative misrepresentations to ATF nor violated a legal duty in continuing the policy. Defs. Br. at 24–28. But this Court has eschewed such a requirement for a *Klein* conspiracy. *See, e.g.*, *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996) (rejecting "contention that . . . 'obstruction' or 'interference' must involve . . . the making of misrepresentations to agency officials or the submitting of false information to the agency" where multi-level marketers instructed distributors to be wary of letting marketing material fall into the agency's hands) (citing cases).

Relying on *Coplan*, Defendants argue that their choice to maintain a digital shredding policy in the absence of a specific, legally binding request does not evidence their dishonest intent. Defs. Br. at 30. That case, however, is distinguishable on

multiple grounds. *Coplan* involved a tax attorney who enforced an accounting firm's corporate policy of discouraging employees from leaving promotional materials with clients in the event that the IRS would later seek to obtain client-held materials during an audit. 703 F.3d at 64. The IRS eventually audited the accounting firm, but never sought the accounting firm's copies of the promotional materials. *Id.* While the IRS never sought those promotional materials, it did specifically request other materials in document requests. *Id.* at 74–76. Therefore, the probative value of the promotional materials was minuscule given the IRS's targeted requests. Moreover, this Court observed that there was no indication that any attorney under those circumstances would have a professional obligation to disclose those materials absent a specific request. *Id.* at 64 & n.21

Notably, the *Coplan* defendants also argued that the court erred in failing to include language in jury instructions that distinguished acts of "legitimate advocacy" on behalf of clients from acts that would tend to show a conspiracy to defraud the United States. *Id.* at 88–89 (including as examples "an agreement between witnesses not to tell the government something unless specifically asked about it; advice from an attorney to a client to assert his constitutional right not to speak to government investigators; an agreement not to create a document that individuals had no obligation to create"). This Court held that "[a]lthough these acts are not necessarily deceitful, no bright line rule excludes such acts from supporting a conspiracy to defraud." *Id.* at 89

47

(further noting that "the current understanding of the *Klein* doctrine does not categorically exclude the foregoing acts").

So, *Coplan* in fact reinforces the district court's holding. Conduct that may be viewed as aboveboard in isolation can take on a different character in the context of a conspiracy. No bright-line rule exists that would have required ATF to request the sales data by name; here, Defendants were keenly aware that the records they allowed to be destroyed would assist ATF's retrieval efforts, and they were not subject to any professional standards that could arguably justify their actions.

### 5.  DeMonico's Repossession of FRT-15s From the 3rd Gen Facility Was an Overt Act in Furtherance of Defendants' Conspiracy

The district court also found that Defendants committed an overt act[13] in furtherance of their conspiracy to defraud the United States when DeMonico removed FRT-15s from a 3rd Gen facility in Utah. A226. While DeMonico was at the facility, he demanded that an employee on site give him a "head start" before leaving. He drove off with a pallet's worth of FRT-15s and made it as far as New Mexico, fully expecting along the way that ATF would try and stop him. SA33–34 (#140, at 463:25–464:14). And – critically – he did all of this under the impression that ATF had a valid warrant

---

[13]  The district court properly construed DeMonico's actions at the 3rd Gen facility as an overt act. A226–30. It was also another example of the dishonest means they employed during the *Klein* conspiracy.

to seize the FRT-15s, and knowing that ATF had a pending investigation that had FRT-15s in its sights. A337:21–A338:3.

Defendants argue that DeMonico's actions were justified because it was later confirmed that the warrant had in fact expired by the time he arrived at the 3rd Gen facility. *See* Defs. Br. at 35–36. Nevertheless, the district court specifically addressed DeMonico's testimony regarding his belief about the search warrant's validity at the time he flew to Utah and declined to credit it. A229. The court's determination warrants substantial deference. *See, e.g.*, *United States v. Mendez*, 315 F.3d 132, 135 (2d Cir. 2002) ("Where the district court's factual findings are premised upon credibility determinations, we grant particularly strong deference to those findings.").

As Defendants would have it, the Fourth Amendment gave them carte blanche to prevent ATF from seizing the FRT-15s at the 3rd Gen facility. Defs. Br. at 34. But this case is not about Defendants' Fourth Amendment rights at all; rather, it is about Defendants' intent to defraud the United States. *Cf. United States v. Southland Corp.*, 760 F.2d 1366, 1373 (2d Cir. 1985) (focusing on "intent[] to defraud the United States"); *United States v. Meneilly*, 78 F. Supp. 2d 95, 108 (E.D.N.Y. 1999) ("[T]he intent element of a . . . *Klein* conspiracy is the intent to commit the substantive offense, *i.e.* to defraud the United States.") (quoting *United States v. Furkin*, 119 F.3d 1276,

1279 (7th Cir. 1997)) (internal quotation marks omitted).[14] At the time he left the 3ʳᵈ Gen facility, DeMonico believed that the ATF had a warrant for the FRT-15s, and he took them anyway. That is all that is needed to affirm the district court's finding.

## D. *Ciminelli* Has No Bearing on this Case

### 1. Nothing About *Ciminelli* Undermines the Mail and Wire Fraud Counts

The district court acknowledged Defendants' contention that the Supreme Court's recent decision in *Ciminelli* foreclosed the United States' mail-and-wire-fraud theories. It summarily rejected it as Defendants conceded during oral argument that the object of the scheme was to deprive customers of money – that is, quintessential fraud. A175.

This has always been the United States' theory of the mail and wire fraud that occurred. The mail and wire fraud counts allege that Defendants engaged in a scheme to defraud to obtain money from their consumers. The United States spelled out the object of the fraud in its opening brief in support of its motion for a TRO. SA6 (#5, at 33) ("There is no question that the purpose of the schemes is to obtain money from

---

[14]    To be clear, the expiration of the search warrant would not have extinguished ATF's lawful authority to seize the FRT-15s. *Cf. United States v. Schwartz*, 924 F.2d 410, 419 (2d Cir. 1991) (observing that while the former Customs Service may not have had a traditional property interest in "arms detained pending an investigation to determine whether or not to seize them formally," it still had a "regulatory interest" in them). In the absence of a search warrant, ATF still maintained regulatory authority to "seize[] and forfeit property involved in a violation" of federal firearms law. *See* 28 C.F.R. § 0.130(b)(1); A216.

recipients of the fraudulent solicitations to benefit defendants."). And the Complaint itself reflects that theory, in that it seeks "restitution to any person who purchased an FRT-15." A61–62. Such an object – money – is expressly what the mail and wire fraud statutes address. *See* 18 U.S.C. §§ 1341, 1343.

In *Ciminelli*, the Supreme Court said nothing about fraud schemes that seek to obtain money. Rather, in *Ciminelli*, the Supreme Court held that a fraud scheme based on a "right-to-control" theory is not a valid basis for liability under mail or wire fraud. *Id*. at 309. It so held because, under such a theory, the object of the fraud – to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions – is not a traditional property interest protected by the fraud statutes. *Id*. Here, unlike in *Ciminelli*, the object of the fraud was money. *Ciminelli* does not apply.

Defendants would have this Court re-characterize the United States' allegations to make *Ciminelli* relevant. They suggest that the United States is really alleging that the object of Defendants' mail and wire fraud schemes has been customer "right-to-control." That is plainly not true. And Defendants point to nothing in the district court record that even suggests that the United States pursued a "right-to-control" theory. Nor could they; it was not how the case was commenced, how it was tried, or how it was decided.

In urging this Court to apply *Ciminelli* here, Defendants mistake the *means* of their fraudulent scheme with the *end* (*object)*. If a defendant carries out the fraud by depriving a victim of information, leading the victim to be deprived of money, then the object of such a fraud is money and the fraud is within the mail or wire fraud statutes. *Ciminelli* did not hold otherwise. That is so because mistaking the means of a fraud with its end, as Defendants invite this Court to do, would lead to an absurd result in this and all other cases alleging mail or wire fraud. It would mean that any time a defendant deprives a victim of potentially valuable information such conduct falls outside of the mail and wire fraud statutes. But such conduct can be found in every mail or wire fraud case. It is how the fraud is accomplished; a defendant provides misinformation to induce a victim to part with something of value. Were Defendants correct in their reading of *Ciminelli,* and they are not, then *Ciminelli* would bar every mail and wire fraud prosecution.

### 2. *Ciminelli* Does Not Apply to Section 371

The district court acknowledged Defendants' *Ciminelli*-premised challenge to the *Klein* conspiracy theory, but rejected it based on this Court's reaffirmation of its longstanding § 371 precedent. A214 n.44 (citing *Atilla*, 966 F.3d at 130). It aptly observed that a *Klein* conspiracy can involve more than just "property or pecuniary loss [resulting from] fraud." A214 n.44. Defendants invite this Court to disavow *Klein* in light of *Ciminelli*, but the latter (which construed only the scope of the mail and wire

fraud statutes) is immaterial to a construction of Section 371. *Ciminelli* addressed the proper construction of the wire fraud statute (and, by implication, the mail fraud statute), which "criminalizes 'scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *See id.* at 312 (quoting 18 U.S.C. § 1343). The qualifier "money or property" limits the reach of the mail and wire fraud statutes to fraudulent schemes with those as an object. *See Ciminelli*, 598 U.S. at 312.

Section 371, in encompassing attempts "to defraud the United States . . . *in any manner or for any purpose*," *see id.* (emphasis added), thus reaches further than the mail or wire fraud statutes. And this is by design: unlike the latter statutes, which "had [their] origin[s] in the desire to protect individual property rights," Section 371 "has for its object the protection and welfare of the government alone." *McNally*, 483 U.S. at 358 n.8. That being the case, the wire fraud statute specifically refers to "money or property," *see* 18 U.S.C. § 1343. *Ciminelli*, 598 U.S. at 312. Section 371, on the other hand, lacks comparable language that would limit schemes to defraud to only those targeting money or property. *See* 18 U.S.C. § 371.

Considering this, it is little wonder that over a century's worth of precedent has construed conduct made unlawful in Section 371 more broadly than the conduct made unlawful in Sections 1341 and 1343. *Ciminelli* does nothing to change that.

CONCLUSION

This Court should affirm the district court's grant of the preliminary injunction.

Dated:    Brooklyn, New York
           April 16, 2024

                                     Respectfully submitted,

                                     BREON PEACE
                                     United States Attorney
                                     Eastern District of New York

VARUNI NELSON
RACHEL G. BALABAN
MICHAEL S. BLUME
DAVID A. COOPER
PAULINA STAMATELOS
Assistant United States Attorneys
    (Of Counsel).

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA V. RARE BREED
TRIGGERS LLC

Docket No. 23-7276

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(g)

I, David A. Cooper, certify that the Brief for the Plaintiff-Appellee, dated

April 16, 2024, complies with Fed. R. App. P. 32(a)(7)(B)(i) and 32(e), and Second

Circuit Local Rule 32.1(a)(4)(A), in that it contains 13,693 words.

Dated:    Brooklyn, New York
          April 16, 2024


                              DAVID A. COOPER
                              Assistant United States Attorney

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

―――――――――――――――――――

UNITED STATES OF AMERICA v. RARE BREED
TRIGGERS LLC

Docket No. 23-7276

―――――――――――――――――――

## **<u>DECLARATION OF SUBMISSION OF PAPER COPIES</u>**

I, _____, hereby declare that, on April 16, 2024, the BRIEF FOR THE PLAINTIFF-APPELLEE and the SUPPLEMENTAL APPENDIX FOR THE PLAINTIFF-APPELLEE, which were electronically filed and served via CM/ECF, also were submitted by hand delivery (6 copies of each) to the Court of Appeals for the Second Circuit.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:    New York, New York
          April 16, 2024

_____
Record Press